James V. BRYANT, Jr.,
Plaintiff–Appellee,

v.

UNITED STATES TREASURY
DEPARTMENT, SECRET
SERVICE, Defendant,

and

Jeff Jordan;  Brian V. Hunter,
Defendants–Appellants.

No. 88–5889.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 10, 1989.

Decided May 18, 1990.

Robert A. Pallemon, Asst. U.S. Atty., Los Angeles, Cal., for defendants-appellants.

Richard Eiden, Los Angeles, Cal., for plaintiff-appellee.

Before SCHROEDER, FLETCHER and TROTT, Circuit Judges.

FLETCHER, Circuit Judge:

Plaintiff-appellee James V. Bryant brought a *Bivens* action after his arrest by two agents of the United States Secret Service. The agents, Jeff Jordan and Brian V. Hunter ("defendants"), bring an interlocutory appeal from the district court's denial in part of their summary judgment motion seeking dismissal based on qualified immunity.[1] Bryant does not cross-appeal other decisions of the district court granting partial summary judgment to these defendants and dismissing other defendants.

## FACTS

On May 3, 1985, a sergeant from the University of Southern California (USC) campus security telephoned defendant Hunter. The sergeant told Hunter that Bryant had, earlier that day, delivered two photocopies of a handwritten letter to two USC administrative offices.[2] The sergeant told Hunter that the letter contained references to a plot to murder President Reagan.

The letter describes a large-scale conspiracy by "Communist white men within the National Council of Churches," whom Bryant refers to collectively as "Mr. Image." In a rambling discourse the letter describes in general terms and with tangential references a conspiracy directed against black males; it condemns Mr. Image, who is viewed as a destructive influence on black males. (Bryant is black.) The letter ends by warning that Mr. Image intended to assassinate Mr. Reagan during his upcoming tour of Germany. (Mr. Image hoped to install then Vice–President Bush in the White House.)

Hunter read the letter and interviewed the two USC employees who had received the photocopies. One employee told Hunter that a black man gave her the letter on May 3, 1985, and told her to give it to the

---

**1.** Jurisdiction in the district court was based on 28 U.S.C. § 1331. Defendants appeal under 28 U.S.C. § 1291; *see also Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

**2.** A copy of the letter is included as an Appendix to this opinion.

director of the USC Budget Office. She said the man made statements about "bloody coups" and "assassination," and also said something about "across the throat" while simultaneously moving his hand horizontally across his throat. A second employee told Hunter that she had been given a photocopy of the letter by a man who told her to forward it to the President of USC. She told Hunter that the man told her "he should have been assassinated in Bonn." She also told Hunter that the man identified himself as James V. Bryant on a piece of paper he left with her.

Hunter determined that the matter warranted further investigation. Secret Service agent Jordan was assigned to assist Hunter. That evening, May 3, 1985, Hunter and Jordan went to a Los Angeles address provided on the letter. They knocked on the door and announced themselves as law enforcement officers. Bryant answered the door. The agents asked if they could enter the residence to speak with Bryant. Bryant gave the agents permission to enter.

Hunter told Bryant that the agents had come because of the photocopied letters. Bryant admitted writing the letter and leaving the photocopies at USC. Hunter asked Bryant to identify "Mr. Image," but Bryant responded in a manner Hunter characterized as "rambling and confused," and, according to Hunter "refus[ed]" to identify Mr. Image. Jordan's declaration is consistent with Hunter's, but neither agent in his declaration quotes Bryant directly.

Hunter asked Bryant for permission to search the residence. Bryant gave permission. Hunter found the original letter but no other relevant evidence. Jordan continued to talk with Bryant, who, according to Jordan, refused to answer questions concerning his attitudes and feelings about the President and refused to state whether he intended to harm the President.

The agents decided to read Bryant his *Miranda* rights. Bryant waived his right to remain silent. The agents again asked him about the identity of Mr. Image. According to Jordan, "Bryant responded in a rambling and confused fashion, such that I could not discern the identity of Mr. Image or whether there was actually a person known as Mr. Image." The agents then told Bryant he was under arrest for threatening to take the life of the President, in violation of 18 U.S.C. § 871.

Bryant was arraigned on May 6, 1985, and ordered held without bail pending a detention hearing. He was held for approximately fourteen days, until the criminal complaint was dismissed on motion by the government on May 17, 1985.

Bryant initiated his suit in May 1986, and filed an amended complaint on January 27, 1987, alleging causes of action under the Federal Tort Claims Act (FTCA) and a *Bivens* theory. On the government's motion, the district court dismissed the FTCA causes of action for lack of jurisdiction and dismissed in its entirety the action against the Secret Service, its director and the Doe defendants. The only remaining defendants were Hunter and Jordan. They moved for summary judgment on the ground of qualified immunity. The district court granted the motion as to some of Bryant's claims, but ruled that defendants were not entitled to qualified immunity on Bryant's Fourth Amendment claims for arrest without probable cause and without a warrant. The court denied the motion for summary judgment because it decided further fact-finding was necessary. Defendants appeal from that denial.

## DISCUSSION

We review a defendant's motion for summary judgment, seeking dismissal on the basis of qualified immunity, *de novo* applying the same standard as did the trial court. *Baker v. Racansky*, 887 F.2d 183, 185 (9th Cir.1989). The question before the district court was whether a secret service officer, in light of clearly established law at the time of Bryant's arrest on May 3, 1985, reasonably could have believed that the information possessed by the arresting agents constituted probable cause to support an arrest under 18 U.S.C. § 871 for threatening the life of the President. *Anderson v. Creighton*, 483 U.S. 635, 107

S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The district court denied the defendants' motion for summary judgment holding that there were genuine issues of material fact. Because the relevant legal rule was clearly established at the time of Bryant's arrest, and the district court properly concluded more factfinding was necessary to determine whether a reasonable secret service agent could have believed that the information he possessed constituted probable cause for that arrest, we affirm the denial of summary judgment.[3]

■ Ordinarily a denial of summary judgment is not appealable because it is purely interlocutory. However, the Court held in *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) that qualified immunity should operate to protect government officials from needlessly defending against suits as well as from liability, and that to prohibit appeals from a denial of qualified immunity until after trial would mean that the immunity effectively would be lost. Appellate review of denial of summary judgment under *Mitchell* is narrow and purely legal. This case requires us to decide two issues: first, were the rights clearly established, and if so, is there any genuine issue of material fact as to whether a reasonable officer could believe they were violated.

■ Qualified immunity is an affirmative defense for which the government official bears the burden of proof. *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982), *Benigni v. City of Hemet*, 853 F.2d 1519, 1525 (9th

Cir.1988). As with all summary judgment motions, the evidence should be viewed in the light most favorable to Bryant as the nonmoving party; to prevail on their motion for summary judgment, the defendants must show that they were reasonable in their belief that they had probable cause. Bryant, however, bears the burden of proving that the right which the defendants allegedly violated was clearly established at the time of their conduct. *Baker*, 887 F.2d at 185, 186.

### I.

■ Federal law enforcement officials cannot be held liable for damages under a *Bivens* theory unless their conduct violates a clearly established constitutional right. *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). As the Supreme Court instructed in *Anderson v. Creighton*, 107 S.Ct. at 3044, the operation of the "clearly established law" standard very much depends upon the level of abstraction at which the relevant legal rule is articulated. The right allegedly violated must not be defined at the level of generality as, for instance, the right to due process of law, for this would "convert the rule of qualified immunity ... into a rule of virtually unqualified liability." The right the official is alleged to have violated must have been clearly established "in a more particularized, and hence more relevant sense: the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 3039.

**3.** It is not clear from either the district court order of partial summary judgment or the transcript of the proceedings whether the district court found that the further factual development was necessary to determine whether the secret service officers had probable cause to arrest Bryant—an improper inquiry in response to an assertion of qualified immunity—or to determine if the officers reasonably could have believed they had probable cause, which is the proper standard for evaluating qualified immunity. The order concludes with the following:

Plaintiff's Fourth Amendment claims based on arrest without probable cause and without

a warrant, however, cannot be dismissed. A genuine factual dispute still exists concerning whether the defendants had probable cause to arrest plaintiff—whether, at the moment of arrest, the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that Bryant had violated 18 U.S.C. Section 871(a).

Because we find that the Secret Service failed to meet their burden of proof as to even the more lenient standard, we affirm the denial of summary judgment.

18 U.S.C. § 871(a), the statute under which Bryant was arrested, provides:

> Whoever knowingly and willfully deposits for conveyance in the mail ... any letter ... containing any threat to take the life of, ... or to inflict bodily harm upon the President of the United States, ... or knowingly and willfully otherwise makes any such threat against the President ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.

■ The statute has been construed to require consideration of both the text or the words themselves as well as the context in which they were delivered. *Roy v. United States,* 416 F.2d 874 (9th Cir.1969); *United States v. Moncrief,* 462 F.2d 762 (9th Cir.1972). In order for a secret service agent reasonably to have believed he had cause to arrest Bryant, the agent must have been reasonable in his belief that Bryant's words and the context in which he delivered them were a serious threat against the president. *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969).

The dissent suggests that this is a vague standard that cannot constitute "clearly established law." It suggests that further case law would be necessary to flesh out what constitutes "probable cause" for violation of the statute before the standard could be regarded as "clearly established." We disagree. This standard is capable of understanding and practical application by law enforcement officers. A statute requiring a knowing or willful threat, interpreted for 20 years to mean "a serious expression of an intention to inflict bodily harm upon or to take the life of the President," *Roy,* 416 F.2d at 877, is not a vague standard like "due process."

## II.

■ Whether a reasonable officer could have believed he had probable cause is a question for the trier of fact, and summary judgment or a directed verdict in a § 1983 action based on lack of probable cause is proper only if there is only one reasonable conclusion a jury could reach. *Kennedy v.*

*L.A. Police Department,* 887 F.2d 920, 924 (9th Cir.1989), *McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9th Cir.1984). Because qualified immunity protects government officials from suit as well as from liability, it is essential that qualified immunity claims be resolved at the earliest possible stage of litigation. *Mitchell* 472 U.S. at 526, 105 S.Ct. at 2815. This necessarily expands the factfinding role that must be played by the district court judge. In some cases, district courts will be able to establish entitlement to qualified immunity before trial and, sometimes, even before discovery. *See, e.g., Ortiz v. Van Auken,* 887 F.2d 1366 (9th Cir.1989) (reversing district court's denial of summary judgment based on claim of qualified immunity, finding that officer who obtained search warrant from judge was entitled to qualified immunity in civil rights action); *Baker v. Racansky,* 887 F.2d 183 (9th Cir.1989) (reversing district court's denial of summary judgment on the basis of qualified immunity, finding that alleged conduct did not violate clearly established law), *Merriman v. Walton,* 856 F.2d 1333 (9th Cir.1988) (affirming district court's denial of defendant's motion for summary judgment on qualified immunity grounds, finding a reasonable police officer would have made further inquiry before making the warrantless arrest). In some cases, however, further development of the record will be necessary. In this case it was proper for the court to require further development of the facts to determine whether the secret service reasonably could have interpreted the letter as violating § 871.

Both the qualified immunity doctrine and § 871 invoke an objective standard. As the court stated in *Anderson,* 107 S.Ct. at 3140, the question to be answered under the qualified immunity doctrine is not whether the officer subjectively acted in good faith, but whether a reasonable officer could have believed he had probable cause to search a residence or to arrest. Likewise, violation of 18 U.S.C. § 871 turns not on whether the individual actually intended to harm the president, but whether a reasonable person would interpret the

words used as a threat. This court has construed the willfulness requirement of the statute as requiring "only that the defendant intentionally make a statement ... in a context or under such circumstances wherein *a reasonable person* would foresee that the statement *would be interpreted by those to whom the maker communicates the statement* as a serious expression of an intention to inflict bodily harm upon ... the President...." *Roy,* 416 F.2d at 877 (emphasis added).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Viewing the letter in the context in which it was delivered and evaluating it in light of these objective standards, the defendants failed to meet their burden of proving that a reasonable Secret Service officer could interpret this letter and the attendant circumstances to constitute a serious threat.

Hunter and Jordan's allegations that they had a reasonable belief that probable cause existed to arrest Bryant for threatening the life of the President was based on Bryant's admission that he wrote and delivered a letter which contained references to assassination attempts directed at Reagan, that Reagan occasionally visited the Los Angeles area, and that, based on their training and experience as Secret Service agents, they believed "Mr. Image" could be a pseudonym for Bryant.

Even accepting the "alter ego" theory that by warning what Mr. Image was going to do, Mr. Bryant was in fact communicating what he himself planned to do, the letter read in its entirety does not appear to make a threat against the president. Most of the letter does not even talk about President Reagan. A more reasonable interpretation of the letter might be that Bryant was trying to convince people of the danger Mr. Image and the conspiracy posed rather than that Bryant was speaking through Mr. Image. The fact that Mr. Image appears to be someone of whom Mr. Bryant disapproves appears to cut against the alter ego theory. Rather, Mr. Image is part of the evil forces that are keeping black men, including Bryant oppressed.

Additionally, there was absolutely nothing in the surrounding circumstances to suggest a different reading of the letter. Rather, a man making vague and disjointed statements and odd gestures was wandering around the USC campus handing out a weird letter (or tract) addressed to no one in particular, which he wanted delivered to university officials. The defendants simply have not sustained the burden of proving their affirmative defense.

It appears from the record that no discovery has taken place. Further development of the record pre-trial or during trial may establish information that the secret service agents possessed that made them believe that Bryant's letter should be interpreted as a serious threat against the president. If further development of the record occurs prior to trial, it is possible that renewal of defendants' motion for summary judgment at a later date might be appropriate. Our remand for further proceedings does not foreclose the defendants presenting additional information that might establish that a reasonable officer could interpret the letter and the surrounding circumstances to constitute probable cause for arresting Bryant for violating § 871. Information, for instance, about what knowledge Secret Service officers possess as a result of their professional training about communications by thought disordered persons as well as any information they may have possessed about Bryant may be necessary in order to resolve the "objective (albeit fact-specific) question whether a reasonable officer could have believed [Bryant's arrest] to be lawful in light of clearly established law and the information the searching officers possessed." *Anderson,* 107 S.Ct. at 3040. As the Court instructed in *Anderson,* "... the determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require

examination of the information possessed by the searching officials." *Id.* at 3040.

We are mindful that the purpose of qualified immunity is to prevent the disruption of effective government that can result from forcing officials to respond to broad discovery and to go to trial. As courts have noted, however, this risk is of most concern where the subjective intent of the officials is at issue. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (restricting the "subjective aspect" of the qualified immunity defense because of the substantial costs that attend the litigation of the subjective good faith of the government official). Where the only question presented to the factfinder is the reasonable interpretation of a letter and the knowledge the Secret Service officers possessed, that risk is considerably and significantly less. The court in *Anderson* left open the possibility for district court judges initially to limit the scope of discovery to facts upon which the immunity determination turns.

In affirming the district court's denial of summary judgment at this point in the proceedings we emphasize that the proper inquiry is *not* whether there was probable cause, but rather whether the secret service agents reasonably could have believed that there was. Qualified immunity doctrine embraces the possibility that government officers will make errors of judgment that are not unreasonable. Further, the inquiry is not whether it was reasonable to believe that Bryant would actually harm the president, but whether it was reasonable to believe that he had issued a threat to harm him.[4] Therefore, the proper factual inquiry is not whether the agents reasonably believed Bryant intended to kill or actually could have assassinated Reagan, but solely whether the agents reasonably believed he had issued a threat.

---

[4] In addition to preventing assaults upon the president, another purpose of 18 U.S.C. § 871 was to prevent the "detrimental effect upon presidential activity and movement that may result simply from a threat." *Roy,* 416 F.2d at 877.

---

## III.

■ In light of the possibility that at some point in the proceedings it may be determined that the officers reasonably believed they had probable cause to arrest, we address a second issue this case presents: whether the law was clearly established as of May 3, 1985, that a warrantless arrest inside an arrestee's residence violated the warrant requirement of the Fourth Amendment, where the arrestee had consented to the agents' entry into the residence.[5] We conclude that the law was not clearly established. In fact the relevant case law strongly suggested that the officers could have believed that their warrantless arrest was lawful so long as they had probable cause and consent to enter the residence. In *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Supreme Court held that "the Fourth Amendment ... prohibits the police from making a warrantless *and nonconsensual* entry into a suspect's home in order to make a routine felony arrest." *Id.* at 576, 100 S.Ct. at 1375 (emphasis added). Similarly, this court stated in dicta in *United States v. Gray,* 626 F.2d 102 (9th Cir. 1980), "The existence of probable cause to arrest, however, does not justify entering a suspect's home without *either consent* or a warrant." *Id.* at 105 (emphasis added). Decisions from other circuits available in early 1985 indicate a trend in favor of upholding warrantless arrests following consensual entries. *See, e.g., Augustine v. Doe,* 740 F.2d 322, 325 (5th Cir.1984) (consent to entry is assumed to be sufficient to permit warrantless arrest) (dicta); *United States v. Briley,* 726 F.2d 1301, 1303 (8th Cir.1984) ("valid and voluntary consent may be followed by a warrantless in-home arrest"); *United States v. White,* 660 F.2d 1178, 1182–83 (7th Cir.1981) (consent, even if obtained by deceit, can justify a subsequent warrantless arrest, at least where

---

[5] Although the district court phrased its order in terms of lack of probable cause *and* lack of warrant, its analysis was limited to whether a reasonable agent could have believed he had probable cause to arrest Bryant. The issue of arrest within a residence without a warrant was not reached.

entry is not obtained solely for the purpose of arresting suspect). Given the state of authority in 1985, appellants are correct that the law did not clearly establish that the agents needed a warrant to arrest Bryant after he consented to entry into his home, so long as probable cause existed. Since there is no factual dispute over Bryant's consent to entry, appellants are entitled to qualified immunity on this issue.

## CONCLUSION

The decision of the district court denying defendants' motion for summary judgment on qualified immunity grounds on the state of the record at this time is AFFIRMED.

## APPENDIX:

## BRYANT'S LETTER

Jim V. Bryant

563–0485

(sis Mollins)

### [illegible]

### Childerns Lives

The "National Council of Negro Women" the "Eastern Star" in the Black churches and Mr "Image" (Communist white men within the "National Council of Churchs) [The name "Image to the Beast" is a bibical name given to and identifys the National Council of Churches as a body] though the NCC is composed largely of women, it is men who realy control it. So it is appropriate to respectfully address the NCC as Mr IMAGE!

So Mr Image and the two above mention organizations are playing Politics with our childerns lives, you would think these organizational cesspools of filth and corruption would find contentment in the millions of lives they are responsible for already destroying Via spreading of Communism, organized Crime, ETC. Now they are at it again, sex naturaly would be involved.

They want to move the So. L.A. Community boundry line from Alameda ST. further east so that white Students in South Gate, Calif. may be bussed to Jordon High, a mostly Black school in Compton Calif.

and West of Alameda Blvd. the reason they desire this, is so that white male students may become romanticaly involved with black girls, the idea so far is fine, most black men who understand would welcome such a move if they to were allowed equal access to white girls.

But two hundred years has proven one thing, White male bigots and the black bigoted femal are jealous of such a union between the blackmale and white-femal. In order to keep this extreemly crule conspiracy alive they conspired to put as many black young men in jail as posiable, and in this particular case that is just what they did. In So. Central L.A. they kept the black young school boy unemployed, knowing that such a hopless state would drive him eventually to brake the law by stealing ETC. and with him out of school and in Jail Jordon High would be ripe for the picking. The Black-femal in the organizations aleady mentioned are extreemly jealous of white women, by lie's and deception they have scared many white women from considering the idea of getting a black male mate. and the White male bigot used every unholy, illegal means to keep the white woman inslaved and away from black men. One of civilized men's greatest test in life, is human relations, inlighten men and women (white & black) must wonder how did these organizations miss the boat with such good examples as Central America, So. America and Mexico to show them the way. I suppose there is no honor among thives will in this case among Mass murders, thats no doubt why they never got together in a respectable marriage relationship, she became a garbage can for his garbage until she became burned out, then he would send her back into the black community to marry some unsuspecting black man.

P.S. Our next white up will concern itself primarily with, NAMES, Addresses, and Owners of Black businesses in South Central L.A. and West L.A. who are presently involved in organized Crime.____

[circled:] Good people must now take a stand or violence and anarcy will rule the streets (Back NICE and we can have a free State)

The Jealous Syndrome has not only an Image concern, it is a concern for a large number of Black men also. Now Mr Image is a bad boy, i think we can all agree on that, and a large number of Black women are no angels. But the Black-male Bourgeois is another breed.

Using Mr Image as a criterion, we will attempt to measure the person and character of the Black-male Bourgeois. In a few words Mr Image can be truthfully described as wicked, cunning, Devilish, but he is not what you would normally consider stuped, but rather he would be considered highly intelligent in a Satonic kind of way, he is very crule and evil needless to say. In contrast, the Black–Male Bourgeois does not have the mental powers of Mr Image and no where near his cunning interlect, the average Black–Male B. is a child in the face of Mr Image, he knows they are cowards so he plays along with their childish blackmailing while at the same time disarming them; In other words the Black–Male B. are mentaly slow and are true cowards, An example of how their blackmailing adventures are carried on. Upon learning of the Blackmailing being ingaged in by the Blackmale B. against the three organizations mentioned earlier, this writter dicussed with Blackmale B. the disadvantage of Blackmailing. I informed them that they need not blackmail Mr Image to get money, i explained to them how Mr Image owed me Two Billion, Eight Hundred fifty million dollars, and that i would be more then happy to share it with them in a joint effort to help the hard core unemployed in Calif.

And since this writter has already instructed Mr Image that Calif. would remain free unlil the U.S. Congress passes a national Sunday Law, (which is near the end of the world) So then jobs for Calif. Citizens is a must, and it was this writters hopes that Blackmale B. would embrace a simular view also, but Mr Image wispered a few dollar Bills into their ears and their commitment to care for the needy was all but forgotton

[circled:]
Mr Image you are still running from me coward, coward, coward, coward, coward, coward.

[circled:]
Mr Image and Blackmale B. will be held responsible for any hurt done to any home or said residents within the L.A. Calif. area thast has been sprayed by NICE Pest exterminators.
James Bryant

What this writter is saying is, a mind as slow as the Black-male B., is not the kind of mind that heaven would have using this power found in the "Image to the Beast" prophecy

Dear friends the God of Abraham, Isaac and Jacob commissioned me to use and be the visable protector of this power until His church relieves me of the responsiability by doing the job this writter is now doing, exposing the Image so that people may know and see.

So my dear Brothers quietly stept aside and let LOVE have it's day.

For you see, Jesus Christ has decreeded it, and tell me who would be so unwise as to go against His will?

You see my brothers (Black-male B.), the only way heaven would allow you to use this power without penalties is that, you must first come to love everyone, regardless of race, color, relegion, creed or even how the person looks.

You see God is beautyfull ps.27:4 & Isa. 33:17, you cant hate Beauty and claim to love the God of Beauty.

[circled:]
it is this writters belief that the Creator of the Universe would have this writter (James V. Bryant) to have a voice pronto in California!!!!!!

[circled:]
"Open rebuke is Better than Secret Love." Pro. 27:5

You must be born again and receive the love of God in your heart, because in your present spirutual state of Jealousy (murder), this power found in the three angeles love message of Rev. 14:9–12 will not dwell in your heart, and without love you dont have REAL power, only a Counterfit power

*Mr Image*

which could lour you into a falsh security, wake up before it is to late!!!!!!

—Now for a bit of news you the reader might find interesting. Mr Image wants to murder President Reagan on his up and coming trip to Germany. WHY?

Will it goes somthing like this,

Now Vice President George Bush, was chief CIA Director back in 1978 and played a key role in the Guyana Massacre, for his faithfullness in carrying out his role in the guyana massacre conspiracy which resulted in over 918 American Citizens being murdered, George Bush was promised the presidency of the United States of America, and Mr Bush's experty in the field of law

[circled:]

be encouraged friends, i'm not perfect but i trust in God and he protects me from Mr Image & Satan.

[circled:]

"The wicked flee when no man pursueth: But the righteous are bold as a LiON." Pro. 28:1

enforcement most certainly would add new demenions to the power of the presidency; the conspiritors desiring to put Bush in the white house were and still are desirous of his maximum presidential powers to be employed and used to silence all matters concerning the Guyana Massacre. And Mr Bush Agreed, that if he was established as President of the U.S., he would do all he could to silence all matters surrounding the Guyana Massacre. But there was just one thing needed tending to, Ronald Reagan had been elected just as planned by the conspiritors, now they needed to remove him so that they (Mr Image & comrades) could install George Bush in the White House. But the now President Reagan has survived two of Mr Image's assassination attempts, you the reader no doubt remember the most recent attempt on the Presidents life involving a crazed young man by the name of Hinkley who shot the president as he was intering his limosine, but the sassination attempt that has the makings of a Hollywood Box-office best seller

[circled:] [illegible ...]

with yours truely, Ronald Reagan as leading man, it surely would have been a big hit had it come off. U.S. news media called it, "the Lybian Hit Squad"

Mr Image had conspired with a large number of U.S. officials in the plot to murder President Reagan, Mr Haig and Mr Allen of the Security council along with Isrial's Mr Begin, who was visiting Washington D.C. on the Middle East question in December of 1981. According to a phenix, Reporter; Mis Wind Black,

Explosives and equipment were obtained in Phenix, Arazona and in San Diego, Calif. by an American international businessman and shiped across the Country by a Palistenian Activest, his car was ticketed less than two blocks from the White House the day before the scheduled meeting.

The Lybian Hit Squad assassination attempt was never carried out due to this writter exposing the Plot back in 1981

[circled:]

Mr Image would rather take on the nation of Japan in a trade war then to tackle with me. he is a coward

the American businessman and the Palestinian were arrested and both pleaded guilty to charges relating to explosives. Now Mr Image wants to try his hand again at attempting to remove President Reagan from the White House Via asassination, while on tour in Germany in May, 1985. Will Mr Image, i guess we stoped you again, Regon you owe me ONE! (sm,ll) better yet Mr President, tell you what, Just write it up on Love's account and count it a joy! Remember the poor, thats how it's done my friends, all you have to do to stop Mr Image is find out what he is goijng to do before he does it, and put it in print along with the Image prophecy as i have done and Mr Images hands are tied. Breefly i just want to caution my Japiness friends not to use the Image Prophecy for Blackmail, Jesus Christ loves you. take my advice, this is much, much bigger then you could ever dream. *DONT Blackmail*!!

[circled:]

One person on Gods side is a *MAjority*! Mr Image's traffic Controled Courts are presently conspiring to steal my Cad car

with the justification they have a right to because i have a ticket, personely I do not feel Mr Image or his Black comrads would get very far with Jesus Christ as my keeper.

so i would encourage them for their own good to leave Sis Smith and Sis Mullins of Ph 563–0485 along they sold me my present car—Mr Image, and leave my car along.

The Blackmale Bourgeois are conspiring to use recently released young men from the L.A. County Jail as hit men and terrorist in Black Communities mostly against Black women, with Mr Images approval naturally.

Mr Image would rather have anarcy and violence in control; to Mr Image, all the good men and women of the State of California we Say, No Anarcy and Violence in Our State.

More on the Guyana M.

[circled material, omiited from photocopy]

The people who just got you out of Jail by using the "Image" Prophecy, did so not because they loved you or carred about you; these blackmale Bourgeois (Communist) leaders got you out of jail in order to use you in gang violence against the very people who want to get you jobs, you see young men, these black Communist do not want you to work, because Mr Image whom they are blackmailing does not want you to work, this compromise agreement was reached for Black-men Bourgeois and the Communist (Mr Image) in government But this writter James V. Bryant will continue to fight for jobs for the young men in South Central L.A.

P.S. Dont Follow the Black male Communist! or its all over.

[circled:] this writter spent six (6) years in prison = Robbery I know!

### President Ronald Reagan.

Mr Image (NCC) still plans on murdering the President on his trip to Germany in May, 1985. Mr Image wants to convince those who have read the "Blackmale Bourgeois" artical you the reader has just read, that the usage of the "Image" Prophecy, as this writter has done in exposing the conspiracy to murder the President is not a sure safeguard against personal damage to others who may desire to protect themselves from the "National Council of Churches" (Mr Image) and his comrades. Mr Image is hoping that if he can get away with murdering Mr Ragon, that those people who are waking up and are discovering the power of the prophecy will lose confidence in the power of the Prophecy to protect those who side with it, or who may be counting on it's protection. P.S. Mr Image (NCC) is scard to death over the posiability of being exposed by the prophecy of Rev. 13:11–17 & Rev. 14:9–11

TROTT, Circuit Judge, dissenting:

I base my respectful quarrel with the majority opinion primarily on one point: I do not believe it was unreasonable for Special Agents Hunter and Jordan to have come to the informed and trained conclusion that they had reasonable cause to believe that Bryant was the murderous "Mr. Image" who was planning and threatening to kill the President of the United States.

Of course, to those of us who are rational, none of Bryant's behavior makes any sense, *but it did to Bryant,* and that is the point. Fantasy cannot be judged by rational standards. One must suspend disbelief and cope with the fantasizer's world. Agents of the Secret Service do this every day as they cope with unstable people who threaten and stalk our public officials. Stable rational people don't attack Presidents. John Hinckley's thought process leading up to his shooting of President Reagan did not make any sense either, but that did not stop him from his assassination attempt. Using the attempted murder of the President to get a date with a movie star is no less strange than either the "thinking" in Bryant's letter *or* his behavior. Yet the majority opinion insists on measuring what confronted Hunter and Jordan in the field by rational standards.

The majority opinion basically sees this case as though others were up to something and Bryant was not involved; he was just turning them in. It speaks of the

threats as not made by Bryant, but only by "Mr. Image," and it asserts that Bryant does not identify with Mr. Image. This completely misses the point. *All* of this was Bryant. There were no "others," and the agents seem to have figured this out quite promptly. People suffering from schizophrenia frequently suffer also from split personality disorders.

After a campus security officer notified them of a plot to kill the President, Hunter and Jordan tried to find out from Bryant more about "Mr. Image." Bryant refused to identify "Mr. Image." To work from the majority opinion's premise, if Bryant did not identify with "Mr. Image" and saw him as his oppressor, why was Bryant reluctant to turn him in? The agents asked Bryant about his own attitude toward the President. He refused to answer. He also refused to state whether he intended to harm President Reagan. Based on the totality of the information presented to them—including the slashing motions Bryant made across his throat coupled with statements by him that the President "should have been killed in Bonn"—Hunter and Jordan concluded *they had probable cause to believe* that Bryant and "Mr. Image" were one and the same deranged person and that his *total behavior* including the letter constituted a threat under section 871.

Under the law, they did not have to be certain or even have proof by a preponderance of the evidence, just probable cause. What the majority opinion does not adequately recognize is that this is a standard that permits mistakes in judgment, assuming *arguendo* that such is the case here.

> We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable. The same is true of their conclusions regarding exigent circumstances.

*Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)

(citation omitted). So even assuming a mistake in judgment as to whether Bryant was threatening the President, the issue remains as to whether the mistake was reasonable.

The Supreme Court in *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986), further refined the term "reasonable" in this context: "but if officers of reasonable competence could disagree on this issue [the existence of probable cause], immunity should be recognized."

*Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), illustrates this principle. In *Hill,* police officers with probable cause to arrest Archie Hill mistook Miller for Hill and arrested him instead. They did so even though Miller ardently denied he was Hill and produced evidence indicating his true identity. Police then searched Hill's apartment incident to the mistaken arrest of Miller, and the prosecution later used some of the evidence seized to convict Hill after police resolved the matter of Miller's mistaken identity.

The Supreme Court dismissed Hill's complaint that Miller's arrest was without probable cause with the following observations that I find helpful in resolving the present case:

> The upshot was that the officers in good faith believed Miller was Hill and arrested him. They were quite wrong as it turned out, and subjective good-faith belief would not in itself justify either the arrest or the subsequent search. But sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest a *reasonable response to the situation facing them at the time.*
>
> ... In these circumstances the police were entitled to do what the law would have allowed them to do if Miller had in fact been Hill, that is, to search incident to arrest and to seize evidence of the crime the police had probable cause to believe Hill had committed. When judged in accordance with *"the factual*

*and practical considerations of every-
day life on which reasonable and pru-
dent men, not legal technicians, act,"*
*Brinegar v. United States,* 338 U.S. 160,
175 [69 S.Ct. 1302, 1310, 93 L.Ed. 1879]
(1949), the arrest and subsequent search
were reasonable and valid under the
Fourth Amendment.

401 U.S. at 803–05, 91 S.Ct. at 1110–11
(emphasis added).

Let me return for a moment to square
one. Probable cause is a deceptively sim-
ple description for a complex concept. One
commentator has called it "an exceedingly
difficult concept to objectify."[1] The fol-
lowing description captures its elusive na-
ture:

> The contours and salient principles of
> probable cause have been faithfully cat-
> alogued in a surfeit of decisional law....
> Probable cause does not emanate from
> an antiseptic courtroom, a sterile library
> or a sacrosanct adytum, nor is it a pris-
> tine "philosophical concept existing in a
> vacuum," but rather it requires a *prag-
> matic* analysis of "everyday life on
> which reasonable and prudent men, not
> legal technicians, act." It is to be viewed
> from the vantage point of a prudent,
> reasonable, cautious police officer on the
> scene at the time of the arrest *guided by
> his experience and training.* It is "a
> plastic concept whose existence depends
> on the facts and circumstances of the
> particular case." Because of the kaleido-
> scopic myriad that goes into the probable
> cause mix "seldom does a decision in one
> case handily dispose of the next." It is
> however the totality of these facts and
> circumstances which is the relevant con-
> sideration. Viewed singly these factors
> may not be dispositive, yet when viewed
> in unison the puzzle may fit.

*United States v. Davis,* 458 F.2d 819, 821
(D.C.Cir.1972) (emphasis added) (citations
omitted).

This description uses the word "pragmat-
ic" in describing the decision making pro-
cess that goes into the determination of
probable cause. Exactly what this means
is best illustrated by another case involving
the current jurisdiction of Secret Service
Agents: the assassination of Senator Rob-
ert Kennedy during his bid to become Pres-
ident of the United States. Shortly after
Senator Kennedy was killed, agents
searched his assassin's room without a
warrant and seized incriminating evidence
later used to convict him of murder. Si-
rhan Sirhan challenged the admissibility of
this evidence on appeal, but the California
Supreme Court turned back his challenge
with this analysis:

> The victim was a major presidential can-
> didate, and a crime of violence had al-
> ready been committed against him. The
> crime thus involved far more than possi-
> bly idle threats. Although the officers
> did not have reasonable cause to believe
> that the house contained evidence of a
> conspiracy to assassinate prominent po-
> litical leaders, we believe that *the mere
> possibility* that there might be such evi-
> dence in the house fully warranted the
> officers' actions. It is not difficult to
> envisage what would have been the ef-
> fect on this nation if several more politi-
> cal assassinations had followed that of
> Senator Kennedy. Today when assassi-
> nations of persons of prominence have
> repeatedly been committed in this coun-
> try, it is essential that law enforcement
> officers be allowed to take fast action in
> their endeavors to combat such crimes.

*People v. Sirhan,* 7 Cal.3d 710, 739, 497
P.2d 1121, 1140, 102 Cal.Rptr. 385, 404
(1972), *cert. denied,* 410 U.S. 947, 93 S.Ct.
1382, 35 L.Ed.2d 613 (1973), overruled in
part on other grounds, *Hawkins v. Superi-
or Court,* 22 Cal.3d 584, 593 n. 7, 586 P.2d
916, 922 n. 7, 150 Cal.Rptr. 435, 441 n. 7
(1978).

That the present case does not involve a
completed crime of violence is not a reason
to distinguish *Sirhan;* it is a reason to
celebrate. We expect the Secret Service to
prevent these crimes, not just attend fu-
nerals when they occur.

The *Davis* court also emphasized the role
that the expertise and special training of
the arresting officer plays in the determi-

---

**1.** Cook, *Probable Cause to Arrest,* 24 Vand.L.    Rev. 317 (1971).

nation of probable cause. This, of course, makes good sense. We spend billions of dollars providing special training for our law enforcement officers. What a waste if we do not rely on it. Here, the Secret Service has a unique and special mission for which its agents are highly trained. We should be cautious before we second-guess their field decisions as to whether probable cause exists to believe someone is threatening the President, especially in situations involving disturbed people. This comes through loud and clear in *Sirhan*.

This brings us back to the present case. I respectfully believe that the majority opinion dismisses too summarily—only grudgingly discussing the "alter ego" theory—the government's argument, and the agents' belief, that Mr. Bryant was really "Mr. Image," and vice versa. Their belief does not strike me as irrational. It reminds me of a case that illustrates the unpredictable dimensions of homicidal fantasies and the role of the alter ego in demented thought patterns.

In the early 1970s, a madman named Kurbegovic terrorized the City of Los Angeles.[2] He fashioned headlines for his cause by detonating bombs in public places, including the Los Angeles International Airport. Lives were lost, and people were maimed. He dictated extremely bizarre taped messages to the public demanding social change. He claimed on the tapes to be "Esak Rasim," speaking first as a field commander of the "Symbionese Liberation Army" ("SLA") and later as the "Chief Military Officer" of "Aliens of America." Although he denied vigorously in court—after being found competent to stand trial—that he was "Esak Rasim" and that he had anything to do with "Aliens of America" or the SLA, it became clear that he, Kurbegovic, was "Aliens of America." This was his fantasy. Similarly, in the present case there was no real "Mr. Image," only Mr. Bryant; and "Mr. Image" resided only in one place, in Bryant's brain. In that sense, Bryant was "Mr. Image"

even though in his warped thinking "Mr. Image" may have been someone else.

It was not unreasonable here for trained agents of the Secret Service to conclude they had a similarly unstable person on their hands. As in the present case, when the police finally arrested Kurbegovic, he certainly did not admit he was Rasim. It is not uncommon for unstable individuals to adopt identities that are nothing more than strange pseudonyms.

Should the agents have walked away from Bryant, leaving him to his own devices while believing he was "Mr. Image"? Even Bryant's attorney conceded in oral argument that *something* had to be done to monitor him. Why? Given the recent history of assaults on our leaders, it would hardly have been "prudent" to have ignored Bryant and let him go his own way.

So who finally ends up in court? Not Bryant, just the agents. It is one thing to expect agents of the Secret Service to throw themselves in front of assassins' bullets. That is a known risk they all willingly incur. It is another altogether to throw them in front of lawsuits in cases like this. This case is precisely what qualified immunity is designed to protect agents like Hunter and Jordan against: being sued for reasonably doing their job.

Measuring all of this against the controlling law, I would reverse the denial of summary judgment on this claim, for several reasons.

First, *no* case on the books in this circuit discusses the contours of probable cause to make an arrest for a violation of section 871, not one. It may be "clearly established" that authorities need probable cause to make an arrest, but case law has not developed or defined what constitutes probable cause in a given situation. *Cf. Capoeman v. Reed*, 754 F.2d 1512 (9th Cir.1985). Because of the uniquely unstable people who run afoul of section 871, I think this dearth of authority is relevant. Second, I believe for the reasons discussed earlier that the agents had probable cause to arrest Bryant and to believe the letter

---

**2.** The terrifying tale of the Alphabet Bomber's murderous rampage is found in *People v. Kurbe-* *govic,* 138 Cal.App.3d 731, 188 Cal.Rptr. 268 (1982).

 

coupled with his conduct constituted a threat against the President. At the very least, "officers of reasonable competence could disagree on this issue." *Malley*, 475 U.S. at 341, 106 S.Ct. at 1096.

Third, *Malley* makes it clear that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* Hunter and Jordan do not qualify as unprotected under this standard. After they arrested Bryant, a *magistrate*—who enjoys absolute immunity—found probable cause to hold him for 14 days before releasing him when the United States Attorney in the exercise of his judgment decided not to prosecute. Moreover, not a scintilla of evidence exists that either agent was acting in bad faith. Leaving Hunter and Jordan out in the cold thus disserves the purpose of qualified immunity. It is unseemly that we, the judiciary, clothe ourselves in absolute immunity and leave the agents to take the hits.

Fourth, Hunter and Jordan professionally discharged their unique role in the criminal justice process: they arrested Bryant and deposited him in the system for the lawyers to figure all of this out. Maybe it was a harmless fantasy, maybe it was not. Maybe "Mr. Image" was a figment of Bryant's imagination. Maybe Mr. Bryant was incompetent to stand trial. This was for lawyers to sort out, not agents.

The Supreme Court calls upon us in *Davis v. Scherer*, 468 U.S. 183, 196, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984), to recognize the demands of the real world in measuring activity by members of the executive branch:

> Nor is it always fair, or sound policy, to demand official compliance with statute and regulation on pain of money damages. Such officials as police officers or prison wardens, to say nothing of higher level executives who enjoy only qualified immunity, routinely make close decisions in the exercise of the broad authority that necessarily is delegated to them. These officials are subject to a plethora of rules, "often so voluminous, ambiguous, and contradictory, and in such flux that officials can only comply

with or enforce them selectively." See P. Schuck, Suing Government 66 (1983). In these circumstances, officials should not err always on the side of caution. "[O]fficials with a broad range of duties and authority must often act swiftly and firmly at the risk that action deferred will be futile or constitute virtual abdication of office."

Today we have failed to give that message due consideration.

As to the second issue in this case, I agree with the majority's analysis, but as to the primary question, I dissent.