## HUNTER ET AL. *v.* BRYANT

No. 90–1440.   Decided December 16, 1991

PER CURIAM.

On May 3, 1985, respondent James V. Bryant delivered two photocopies of a handwritten letter to two administrative

offices at the University of Southern California. The rambling letter referred to a plot to assassinate President Ronald Reagan by "Mr Image," who was described as "Communist white men within the 'National Council of Churches.'" The letter stated that "Mr Image wants to murder President Reagan on his up and coming trip to Germany," that "Mr Image had conspired with a large number of U. S. officials in the plot to murder President Reagan" and others, and that "Mr Image (NCC) still plans on murdering the President on his trip to Germany in May, 1985." See *Bryant* v. *United States Treasury Department, Secret Service*, 903 F. 2d 717, 724–727 (CA9 1990) (Bryant's letter). President Reagan was traveling in Germany at the time.

A campus police sergeant telephoned the Secret Service, and agent Brian Hunter responded to the call. After reading the letter, agent Hunter interviewed university employees. One identified James Bryant as the man who had delivered the letter and reported that Bryant had "told her '[h]e should have been assassinated in Bonn.'" Another employee said that the man who delivered the letter made statements about " 'bloody coups' " and " 'assassination,' " and said something about " 'across the throat' " while moving his hand horizontally across his throat to simulate a cutting action. *Id.*, at 718–719.

Hunter and another Secret Service agent, Jeffrey Jordan, then visited a local address that appeared on the letter. Bryant came to the door and gave the agents permission to enter. He admitted writing and delivering the letter, but refused to identify "Mr. Image" and answered questions about "Mr. Image" in a rambling fashion. Bryant gave Hunter permission to search the apartment, and the agent found the original of the letter. While the search was underway, Jordan continued questioning Bryant, who refused to answer questions about his feelings toward the President or to state whether he intended to harm the President. *Id.*, at 719.

Hunter and Jordan arrested Bryant for making threats against the President, in violation of 18 U. S. C. § 871(a).* Bryant was arraigned and held without bond until May 17, 1985, when the criminal complaint was dismissed on the Government's motion.

Bryant subsequently sued agents Hunter and Jordan, the United States Department of the Treasury, and the Director of the Secret Service, seeking recovery under the Federal Tort Claims Act and alleging that the agents had violated his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments. See *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971). The District Court dismissed all defendants other than agents Hunter and Jordan and all causes of action other than Bryant's Fourth Amendment claims for arrest without probable cause and without a warrant. The court denied the agents' motion for summary judgment on qualified immunity grounds.

On appeal, a Ninth Circuit panel held that the agents were entitled to qualified immunity for arresting Bryant without a warrant because, at that time, the warrant requirement was not clearly established for situations in which the arrestee had consented to the agents' entry into a residence. 903 F. 2d, at 723–724.

However, the panel divided on the question whether the agents were entitled to immunity on the claim that they had

---

*Title 18 U. S. C. § 871(a) provides:

"Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

arrested Bryant without probable cause. The majority concluded that the agents had failed to sustain the burden of establishing qualified immunity because their reason for arresting Bryant—their belief that the "Mr. Image" plotting to kill the President in Bryant's letter could be a pseudonym for Bryant—was not the most reasonable reading of Bryant's letter:

> "Even accepting the 'alter ego' theory that by warning what Mr. Image was going to do, Mr. Bryant was in fact communicating what he himself planned to do, the letter read in its entirety does not appear to make a threat against the president. Most of the letter does not even talk about President Reagan. *A more reasonable interpretation of the letter might be that Bryant was trying to convince people of the danger Mr. Image and the conspiracy posed rather than that Bryant was speaking through Mr. Image.*" *Id.*, at 722 (emphasis added).

Our cases establish that qualified immunity shields agents Hunter and Jordan from suit for damages if "a reasonable officer could have believed [Bryant's arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Anderson* v. *Creighton*, 483 U. S. 635, 641 (1987). Even law enforcement officials who "reasonably but mistakenly conclude that probable cause is present" are entitled to immunity. *Ibid.* Moreover, because "[t]he entitlement is an *immunity from suit* rather than a mere defense to liability," *Mitchell* v. *Forsyth*, 472 U. S. 511, 526 (1985), we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation. See *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982); *Davis* v. *Scherer*, 468 U. S. 183, 195 (1984); *Mitchell, supra,* at 526; *Malley* v. *Briggs,* 475 U. S. 335, 341 (1986); *Anderson, supra,* at 646, n. 6.

The decision of the Ninth Circuit ignores the import of these decisions. The Court of Appeals' confusion is evident

from its statement that "[w]hether a reasonable officer could have believed he had probable cause is a question for the trier of fact, and summary judgment . . . based on lack of probable cause is proper only if there is only one reasonable conclusion a jury could reach." 903 F. 2d, at 721. This statement of law is wrong for two reasons. First, it routinely places the question of immunity in the hands of the jury. Immunity ordinarily should be decided by the court long before trial. See *Mitchell, supra,* at 527–529. Second, the court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.

Under settled law, Secret Service Agents Hunter and Jordan are entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest Bryant. Probable cause existed if "at the moment the arrest was made . . . the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that Bryant had violated 18 U. S. C. § 871. *Beck* v. *Ohio,* 379 U. S. 89, 91 (1964).

When Agents Hunter and Jordan arrested Bryant, they possessed trustworthy information that Bryant had written a letter containing references to an assassination scheme directed against the President, that Bryant was cognizant of the President's whereabouts, that Bryant had made an oral statement that "'[h]e should have been assassinated in Bonn,'" 903 F. 2d, at 719, and that Bryant refused to answer questions about whether he intended to harm the President. On the basis of this information, a Magistrate ordered Bryant to be held without bond.

These undisputed facts establish that the Secret Service agents are entitled to qualified immunity. Even if we assumed, *arguendo,* that they (*and* the magistrate) erred in concluding that probable cause existed to arrest Bryant, the

agents nevertheless would be entitled to qualified immunity because their decision was reasonable, even if mistaken. *Anderson, supra,* at 641.

The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley, supra,* at 343, 341. This accommodation for reasonable error exists because "officials should not err always on the side of caution" because they fear being sued. *Davis, supra,* at 196. Our national experience has taught that this principle is nowhere more important than when the specter of Presidential assassination is raised.

The petition for a writ of certiorari is granted, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS took no part in the consideration or decision of this case.

JUSTICE SCALIA, concurring in the judgment.

In my view the Ninth Circuit's opinion purported to apply the standard for summary judgment that today's opinion demands. Its error was in finding, on the facts before it, that the standard was not met. Since I think it worthwhile to establish that this Court will not let such a mistake stand with respect to those who guard the life of the President, I concur in the summary reversal.

JUSTICE STEVENS, dissenting.

The question in this case is *not* whether a reasonable officer could have believed that respondent posed a threat to the life of the President. Those "who guard the life of the President," *ante* this page (SCALIA, J., concurring in judgment), properly rely on the slightest bits of evidence—noth-

ing more than hunches or suspicion—in taking precautions to avoid the ever-present danger of assassination. Mere suspicion is obviously a sufficient justification for a host of protective measures such as, for example, careful surveillance of a person like respondent. The question that is presented, however, is whether a reasonable trained law enforcement officer could have concluded that the evidence available to petitioners at the time they arrested respondent constituted probable cause to believe that he had committed the crime of threatening the life of President Reagan.

The evidence on which the officers relied to support their conclusion that probable cause existed is summarized in two affidavits which they filed in support of their motion for summary judgment. That evidence includes three relevant components: (1) a rambling, confusing letter written by respondent contained statements indicating that a "Mr Image" intended to assassinate the President while he was in Germany; (2) the officers "believed that the use of the term Mr. Image may have been a pseudonym for [respondent] Bryant and that Bryant was writing in the third person," App. to Pet. for Cert. 48a, 54a; and (3) when respondent delivered a copy of the letter to Veronica Tincher in the budget office of the University of Southern California, he "said something about 'across the throat,' while simultaneously moving his hand horizontally across his throat to simulate a cutting action," id., at 43a.

The affidavits explained that in addition to the above facts, the affiants were "concerned that Bryant might pose a threat to the President's well-being." Id., at 48a, 54a. It is also noteworthy that when the officers visited Bryant in his apartment, he allowed them to enter and voluntarily consented to a search for weapons in plain view, and then to a second search of the entire residence. That search resulted in nothing more than the discovery of the original of the letter.

The letter is the key piece of evidence supposedly justifying a finding that the officers reasonably believed that Bryant had threatened the life of the President. Bryant freely admitted to writing the letter, and the letter does refer to, among other things, a scheme to assassinate President Reagan. The letter does not, however, state that it is Bryant who intends to assassinate the President. Rather, the letter warns that "Mr Image" intends to harm the President. Nor does the letter leave the identity of "Mr Image" in doubt. In its first sentence, the letter identifies the term parenthetically: "Mr 'Image' (Communist white men within the 'National Council of Churches).'" *Bryant* v. *United States Treasury Department, Secret Service,* 903 F. 2d 717, 724 (CA9 1990) (reprinting Bryant's letter). The letter then proceeds to explain the derivation of the term: "The name 'Image to the Beast' is a biblical name given to and identifys *[sic]* the National Council of Churches as a body . . . though the NCC is composed largely of women, it is men who really control it. So it is appropriate to respectfully address the NCC as Mr IMAGE!" *Ibid.* A postscript to the letter further specifies the Biblical origin of the term and its identification with the National Council of Churches: "Mr Image ←(NCC) is scard *[sic]* to death over the posiability *[sic]* of being exposed by the prophecy of Rev. 13:11–17 & Rev. 14:9–11."[1] *Id.,* at 727. At other places in the letter, as well, "Mr Image" is identified with the National Council of Churches through parenthetical references.

Bryant's letter advances a conspiracy theory accusing the National Council of Churches of spreading communism and

---

[1] In the original, "(NCC)" is written above the word "Image," and the connecting arrow runs downward. Defendants' Memorandum of Points and Authorities in Support of Motion for Summary Judgment in No. CV 86–3134 (CD Cal.), p. 61. The arrow is omitted in the copy of the letter reprinted in the Court of Appeals' opinion.

scheming to assassinate the President.[2]   Such a theory is of course absurd, but this absurdity does not mean that Bryant was threatening to harm the President.   A vast gap separates the conclusion that a letter warning of an assassination threat is preposterous or delusional and the conclusion that the letter, itself, constitutes a threat by the author.   Even if a delusional warning may serve to identify the author as mentally unstable and justify appropriate surveillance of his activities, such legitimate concern does not transform a delusional warning into a threat.   As I suggested at the outset, the confusing set of facts may well have justified a trained officer in coming to the conclusion that a mentally unstable person might pose a threat to the President's well-being. No matter how reasonable such an officer's belief may have been, that kind of suspicion is not a substitute for a reasonable determination that the *evidence* established probable cause to arrest.

---

[2] The National Council of Churches has at times come under attack for allegedly supporting subversive activity.   In 1983, for example, such charges were leveled against the National Council of Churches in a segment of the television program "60 Minutes" and in an article appearing in the Reader's Digest, Isaac, Do You Know Where Your Church Offerings Go?, Reader's Digest, Jan. 1983, pp. 120–125.   The president of the National Council of Churches responded to media reports by stating: " '[T]he National Council of Churches is not a worldwide socialist conspiracy.   [It] does not supply arms to communists, revolutionaries, or anyone else.   The National Council of Churches does not believe in the violent overthrow of any government.' "   Christian Science Monitor, May 5, 1983, p. 3 (reporting speech of Bishop James Armstrong, president of the National Council of Churches).   For reports of criticism of the National Council of Churches closer in time to the incident at issue here, see, *e. g.,* Los Angeles Times, Apr. 27, 1985, pt. 2, p. 5, col. 1 (reporting statement by Peter Reddaway of London School of Economics that " '[w]ittingly or unwittingly, the NCC is deeply involved in concealing and distorting the truth about the Soviet Union . . .' "); *id.,* Apr. 25, 1985, pt. 5, p. 1, col. 2 (reporting statement by associate professor of history at Seattle Pacific University that the National Council of Churches "has done a disservice to Christians in the Soviet Union by 'buying the Soviet line' as handed to them by official Soviet church leaders . . .").

The District Court denied the petitioners' motion for summary judgment seeking dismissal on the ground of qualified immunity because it decided that further factfinding was necessary. On such a motion, the court was of course required to resolve any disputed question of fact against the moving parties. In my opinion the Court of Appeals correctly stated the governing standards when it wrote:

"Qualified immunity is an affirmative defense for which the government official bears the burden of proof. *Harlow* v. *Fitzgerald,* [457 U. S. 800, 815 (1982)], *Benigni* v. *City of Hemet,* 853 F. 2d 1519, 1525 (9th Cir. 1988). As with all summary judgment motions, the evidence should be viewed in the light most favorable to Bryant as the nonmoving party; to prevail on their motion for summary judgment, the defendants must show that they were reasonable in their belief that they had probable cause. Bryant, however, bears the burden of proving that the right which the defendants allegedly violated was clearly established at the time of their conduct. . . .

.    .    .    .    .

". . . In order for a secret service agent reasonably to have believed he had cause to arrest Bryant, the agent must have been reasonable in his belief that Bryant's words and the context in which he delivered them were a serious threat against the president. *Watts* v. *United States,* [394 U. S. 705 (1969) *(per curiam)*].

.    .    .    .    .

"Whether a reasonable officer could have believed he had probable cause is a question for the trier of fact, and summary judgment or a directed verdict in a § 1983 action based on lack of probable cause is proper only if there is only one reasonable conclusion a jury could reach. *Kennedy* v. *L. A. Police Department,* 887 F. 2d 920, 924 (9th Cir. 1989), *McKenzie* v. *Lamb,* 738 F. 2d 1005, 1008 (9th Cir. 1984). Because qualified immunity protects government officials from suit as well as from

> liability, it is essential that qualified immunity claims be resolved at the earliest possible stage of litigation. *Mitchell* [v. *Forsyth*, 472 U. S. 511, 526 (1985)]. This necessarily expands the factfinding role that must be played by the district court judge. In some cases, district courts will be able to establish entitlement to qualified immunity before trial and, sometimes, even before discovery. . . . In some cases, however, further development of the record will be necessary. In this case it was proper for the court to require further development of the facts to determine whether the secret service reasonably could have interpreted the letter as violating § 871." 903 F. 2d, at 720–721.

Like JUSTICE SCALIA, I am satisfied that the Court of Appeals applied the correct legal standard when it affirmed the District Court's refusal to grant summary judgment in favor of petitioners. When the Court of Appeals opinion is read in its entirety, that conclusion is inescapable. Unlike JUSTICE SCALIA, however, I am also satisfied that when the proper legal standards are applied to this record, with the evidence examined in the light most favorable to the nonmoving party, petitioners have not yet established that a reasonable officer could have concluded that he had sufficient *evidence* to support a finding of probable cause at the time of respondent's arrest. I also think it unwise for this Court, on the basis of its *de novo* review of a question of fact, to reject a determination on which both the District Court and the Court of Appeals agreed.

Accordingly, I respectfully dissent.

JUSTICE KENNEDY, dissenting.

Petitioners in this case are agents of the Secret Service. Among the questions presented are the proper interpretation of 18 U. S. C. § 871(a), which prohibits mail threats against the President, and the proper standard for summary

judgment on grounds of qualified immunity. Whether implied or expressed, our resolution of these questions will be parsed by the Service and by later courts. The importance of these questions suggests that we should not dispose of them in summary fashion.

For the reasons stated in today's *per curiam* opinion and in the dissent by Judge Trott in the Court of Appeals, I must agree that the holding of the Court of Appeals is open to serious question. The majority opinion of that court seems not to have considered all of the facts on which the agents relied, in particular the statements made by Bryant and his responses (or nonresponses) to the agents' questions. This calls in question its determination that qualified immunity has not been established on summary judgment.

To reverse in this case, however, the Court considers an issue on which some doubt has been expressed, which is whether the Court of Appeals applied the correct legal standard to resolve the qualified immunity issue on summary judgment. Two Members of the Court disagree with the statement in the *per curiam* opinion that the Court of Appeals misstated the law. See *ante*, at 227; *ante*, at 229 (SCALIA, J., concurring in judgment); *ante*, at 234 (STEVENS, J., dissenting). Given this disagreement, as well as the precedential weight that later courts will accord to all of the questions presented in the case and addressed here in express terms or by clear implication, the case does not lend itself to summary disposition. I would set the case for full briefing and oral argument.

For these reasons, I dissent from the judgment of summary reversal in this case.