Scott D. **WULLSCHLEGER,** Plaintiff,

v.

Randy **PETERS;** Donald **Miller;** Mike **O'Brien;** Mike **Bauer;** Bill **Mizner;** Jon **Downey;** Richard **Drummond;** Vern **Hjorth;** Sandy **Thighe;** Joseph **Smith;** Madison County, **Nebraska;** The City of **Norfolk, Nebraska;** John Does 1 Through **10,** real and true names **unknown;** Jane Does 1 Through 10, real and true names **unknown;** jointly and **severally,** in their official capacity and as **individuals,** Defendants.

No. 4:97CV3105.

United States District Court, D. Nebraska.

Nov. 20, 1998.

Glen A. Murray, Grand Island, NE, for Plaintiff.

Clinton J. Gatz, Jr., Ronald E. Temple, Gatz, Fitzgerald Law Firm, Norfolk, NE, Richard L. Boucher, Kimberly K. Sturzenegger, Mary C. Gaines, Boucher Law Firm, Lincoln, NE, Terri M. Weeks, Attorney General's Office, Lincoln, NE, for Defendant.

### MEMORANDUM AND ORDER

KOPF, District Judge.

This case presents the novel question of whether law enforcement personnel have qualified immunity from suit if city police officers mistakenly obtain search warrants and then serve the warrants and make warrantless arrests outside of the city limits but with the assistance of deputy sheriffs and state troopers. This issue and related ones are presented in the motions for summary judgment filed by the defendants.

The motions are submitted by: Sandy Thighe (Thighe), a Nebraska state trooper (Filing 54); Randy Peters (Peters), a City of Norfolk police officer (Filing 69); Donald Miller (Miller), a City of Norfolk police officer (Filing 69); Mike O'Brien (O'Brien), a City of Norfolk police officer (Filing 69); Mike Bauer (Bauer), a City of Norfolk police officer (Filing 69); Bill Mizner (Mizner), the Chief of Police for the City of Norfolk (Filing 69); the City of Norfolk (Filing 69); Madison County, Nebraska (Filing 77); Jon Downey (Downey), a Madison County deputy sheriff (Filing 78); Richard Drummond (Drummond), a Madison County deputy sheriff (Filing 79); Vern Hjorth (Hjorth), the Madison County Sheriff (Filing 80); and Joseph Smith (Smith), the Madison County Attorney (Filing 81). For the following reasons, I will grant all the motions.

## I. BACKGROUND

The material facts are genuinely undisputed. They are set forth in various evidence submissions (Filings 55, 64, 70, 76, 86, 89). I will now summarize those facts in the light most favorable to the plaintiff.

This case arises out of a failed criminal prosecution of the plaintiff. The plaintiff resided at 1702 North 37th Street, Norfolk, Madison County, Nebraska. While the plaintiff's address suggests that he resides within the City of Norfolk, his residence is outside the city limits. However, the residence is within Madison County, Nebraska.

On January 25, 1996, detective Randy Peters of the Norfolk Police Department signed an affidavit in support of a search warrant. (Filing 70, Ex. 3.) He obtained a search warrant from a county court judge to search the residence of the plaintiff at "1702 North 37th Street, Norfolk, *Madison County*, Nebraska." (Filing 70, Ex. 4.) (Emphasis added.) Although Peters knew that the residence was outside the city limits, he did not specifically inform the judge of this fact. The search warrant was addressed to: "De-

tective Randy Peters of the Norfolk Police Division." (*Id.*) The warrant authorized Detective Peters to use "necessary and proper assistance." (*Id.*) The warrant also authorized a search for "bank and business records, copies of bank drafts, and other records related to transactions with Gordon Kosobucki." (*Id.*)

Prior to obtaining the warrant, Detective Peters had been investigating a criminal complaint from Gordon Kosobucki. Kosobucki reported that he had been defrauded when, in March of 1995, he wired $10,000 to the plaintiff for the ostensible purposes of an investment. In May of 1995, Kosobucki became concerned about his investment and asked the plaintiff to return the money. Kosobucki informed Peters that the plaintiff wrote Kosobucki a letter in May of 1995. In that letter the plaintiff told Kosobucki that his money had earned over $48,000, and that plaintiff would return the principal and interest. When the money was not returned, Kosobucki contacted the authorities.

On several occasions prior to January 25, 1996, the plaintiff contacted Joseph Smith, the Madison County Attorney. Plaintiff wanted to know whether criminal charges were going to be filed against him on the Kosobucki matter. Smith told the plaintiff that the matter was under investigation. Plaintiff told Smith that he was making an effort to pay Kosobucki, but the money was tied up in a foreign investment. In early January of 1996, the plaintiff sent Smith a letter seeking immunity from prosecution with regard to all crimes that he had committed between March 22, 1995 and the date of the proposed stipulation. Smith did not respond to the proposal. Smith forwarded the proposed stipulation to Detective Peters. At no time did Smith perform any investigative function regarding the criminal investigation of the plaintiff.

In late January of 1996, Peters contacted Smith. Peters had drafted an affidavit (Filing 70, Ex. 3) in support of a search warrant to look for evidence of fraud. Peters asked Smith if he believed that the facts set forth in the affidavit established adequate probable cause to obtain a lawful warrant to search the plaintiff's home. After a brief discussion, Smith told Peters that a judge could find adequate probable cause to support a search warrant based on the information.

While the Kosobucki complaint was being investigated, the Madison County Sheriff's Office and the City of Norfolk Police Department were also investigating a rash of burglaries in which the plaintiff was a suspect. These burglaries took place both within the City of Norfolk and outside the City of Norfolk. Deputy Sheriff Jon Downey was assigned to investigate for the Madison County Sheriff's office. He compared notes with Detective Peters of the Norfolk Police Department and learned that Peters was also investigating similar burglaries within the city limits of Norfolk, Nebraska. These burglaries were similar in that they involved the theft of women's personal items, including undergarments, as well as jewelry, cigarette lighters and a cordless phone. During the investigation, the authorities learned that the plaintiff had been convicted of burglary in the past. These burglaries included the theft of women's undergarments.

On January 25, 1996, Peters contacted Downey and Drummond of the Madison County Sheriff's Office to seek assistance in executing the warrant regarding the Kosobucki investigation. Peters knew that the plaintiff's home was outside the city limits, and so he sought the assistance of the Madison County sheriffs because he believed they had the power to assist him in the service of the warrant. Downey and Drummond agreed to assist. In addition, Downey had the help of his fellow officers Miller, O'Brien, and, perhaps, Bauer.[1]

At about 11:30 a.m., the warrant was served upon the plaintiff by the law enforcement officers. While Downey was conducting a search, he noticed, in plain sight, a cordless telephone. It looked like one that had been reported stolen. Downey had brought with him a burglary report which contained the serial number for the cordless

---

1. The plaintiff states that Bauer was present on January 25, 1996, but Bauer only admits being present on January 30, 1996.

phone that had been reported stolen. Downey compared the identification number of the phone in the plaintiff's home with the identification number in the investigation report. The numbers matched. The phone was then seized by Downey.

While the seizure of the phone was taking place, the law enforcement officers also proceeded to search for the items related to the Kosobucki investigation. They went to the plaintiff's bedroom where they found a cigarette lighter with the initials "KH" lying on the floor near the bed. The officers recognized that a similar cigarette lighter with those same initials had been reported stolen during a burglary in the City of Norfolk. Accordingly, the lighter was seized.

Also on the floor in the plaintiffs bedroom near the lighter, the officers found numerous items of women's underwear and swim wear. Some of the clothing was in plain view piled on the floor and some of it was found in a black duffle bag that was lying on the floor. The bag was searched to look for documents identified in the search warrant. The women's clothing was seized as well because the officers believed the apparel came from the burglaries. The officers also found various phone bills, financial records, correspondence and a checkbook that they believed related to the Kosobucki investigation. These items were seized pursuant to the warrant.

After the search was completed, Downey and Peters spoke with the plaintiff. Detective Peters read plaintiff his Miranda rights. The plaintiff denied committing any crimes, and did not volunteer any information which implicated him in any of the crimes. Based upon the items found in the home, the plaintiff was arrested for burglary.

Deputy Sheriff Drummond did not seize any items from the home, although he participated in the search. Drummond was also not involved in detaining or interrogating the plaintiff after the search warrant was executed. Officers Miller and O'Brien also participated in the search, but what, if anything, they seized is unclear. It is also unclear what, if anything, they had to do with the arrest and interrogation of the plaintiff. If Bauer was present, the evidence does not describe what he did.

During the search, Miller found a computer. As he was scanning the computer looking for documents related to the Kosobucki matter, he noticed a word processing program that was licensed to the law firm of Brogan & Stafford, P.C. He inquired of the plaintiff about the program, and was told that the plaintiff had borrowed it. The plaintiff also said the computer belonged to his father. Miller did not seize the computer or the program.

The plaintiff was taken to the Norfolk police station where he was further questioned. The plaintiff asked to speak to Madison County Attorney Smith and so Smith came to the police station. Most of the conversation that Smith had with the plaintiff was videotaped, and the videotape is in evidence. The next day plaintiff was released on bond.

In the days following the search, various victims identified items seized from the plaintiff's home as being stolen. Specifically, the phone was identified as being stolen, and various undergarments and swim clothes seized from the plaintiff's home were also identified as being stolen. Various seized cigarette lighters were also identified.

On January 30, 1996, Miller received a report that the Brogan & Stafford law firm in Norfolk had been burglarized. Taken from the law firm was a computer and related software, including a word processing program that had been licensed to the firm. Remembering the computer and the program he had seen in the plaintiff's home, and believing they were the items that had been stolen, Miller prepared a search warrant affidavit. (Filing 70, Ex. 5.)

Based on Miller's affidavit, the judge issued a search warrant for the residence located at: "1702 North 37th Street, Norfolk *Madison County,* Nebraska." (Filing 70, ex. 6.) (Emphasis added.) The warrant was directed to "Detective Donald Miller of the Norfolk Police Division and Officers under his direction and supervision." (*Id.*) The warrant also authorized Miller to use "necessary and proper assistance." (*Id.*) The warrant authorized the search for a computer, printer and related equipment. Although

Miller knew the residence was situated outside the city limits, he did not specifically inform the judge of that fact.

Miller, knowing the residence was located outside the city limits, contacted trooper Thighe. Miller contacted Thighe because he believed that as a state trooper she had the power to assist him in the service of the warrant. The trooper agreed to assist in the service of the warrant. Miller, Bauer and Tighe then went to the residence. A computer and related equipment were seized. The serial number on the computer had been "scraped off." The licensed program Miller had earlier observed was gone. The plaintiff's father denied ownership of the computer. The plaintiff was again arrested for burglary, and taken into custody.

The plaintiff was prosecuted in the Madison County District Court for three counts of felony burglary. Smith did not file criminal charges on the Kosobucki fraud matter. According to Smith, he refrained from filing fraud charges because the federal government was conducting a parallel investigation on suspicion of wire and mail fraud. Smith believed that if criminal fraud charges were warranted, the plaintiff would be prosecuted in federal court.

During the burglary case, the plaintiff's defense lawyer filed a motion to suppress. The plaintiff argued that the searches of his residence on January 25, 1995, and January 30, 1996, were invalid because the warrants were directed to City of Norfolk police officers. The plaintiff argued that the police had no jurisdiction outside the city limits, and thus the warrants were invalid.

The trial judge agreed with the plaintiff. (Filing 70, Ex. 8) The judge reasoned that because Neb.Rev.Stat. § 29–814.04 (Michie 1995) requires that the "officer shall be specifically named or described by the title of his or her office," and because the City of Norfolk officers were outside of their primary area of jurisdiction when the warrants were executed, the search of the plaintiff's home "was the equivalent of a warrantless search." (Filing 70, Ex. 8 at 3.) Accordingly, the judge suppressed the fruits of the search and ordered return of the seized property.

The State of Nebraska did not appeal. As a consequence, the burglary case was dropped.

The judge did not cite any cases that supported his ruling. Specifically, he did not discuss various Nebraska statutes that authorize county sheriffs and state patrol troopers to execute or assist in the execution of search warrants and to make warrantless arrests. *See e.g.,* Neb.Rev.Stat. § 23–1701.04 (Michie 1995) (county sheriff; power to serve process); Neb.Rev.Stat. § 29–401 (Michie 1995) (county sheriff; power to make arrests); Neb.Rev.Stat. § 29–404.02(1) (Michie 1995) (power of "peace officer" to make warrantless arrests for felonies); Neb.Rev.Stat. § 84–106 (Michie 1995) (state troopers are deputized sheriffs). He also did not discuss the significance, if any, of the active participation of the trooper and the deputy sheriffs who possessed the undisputed authority to apply for and serve the warrants and make warrantless arrests.

There is no evidence that Sheriff Hjorth participated in or knew of any of the events which give rise to this case. The same is true for Chief Mizner.

## II. DISCUSSION

I next apply the law to the material facts that are genuinely undisputed. In so doing, I refer to the plaintiff's amended complaint (Filing 74).

### A. Counts I & III

### Wrongful Search for and Seizure of Property January 25 & January 30, 1996

■ In these counts the plaintiff asserts two related claims against the police officers, deputy sheriffs and state trooper who executed the two warrants. First, he argues that his Fourth Amendment rights were violated because the search warrants executed on January 25 and January 30 were invalid. He states that the warrants were invalid because they were directed to city police officers who had no jurisdiction to execute the warrants outside the city. Second, he argues that on January 25, 1996, the officers took property that was not described in the warrant, and thus his Fourth Amendment rights were violated. The defendants assert the defense of

qualified immunity as to these claims.[2] I agree that the defendants have such immunity.

### 1. Qualified Immunity

 Government officials, like prosecutors or police officers, who are sued for damages in their individual capacities under 42 U.S.C. § 1983 for their performance of discretionary functions are entitled to a qualified immunity defense if they prove that their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity is a question of law. To avoid subjecting officials to the distraction and deterrence of unnecessary trials, the Supreme Court has emphasized that summary judgment should be granted to a § 1983 defendant on qualified immunity grounds " 'if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact ... violated clearly established law.' " *Johnson v. Boreani,* 946 F.2d 67, 69–70 (8th Cir.1991) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

 Resolution of the qualified immunity defense in the summary judgment context requires a step-by-step analysis. *Cross v. City of Des Moines,* 965 F.2d 629, 631–33 (8th Cir.1992) (reversing decision denying motion for summary judgment on qualified immunity grounds where police officers entered a woman's apartment in an attempt to find her husband who was the subject of an arrest warrant). First, the court must determine whether the plaintiff has alleged the violation of a constitutional right. *Id.* Second, the court must determine whether the right was "clearly established" at the time of the alleged violation. *Id.* Third, if the constitutional right was clearly established, the court must determine whether there are material facts in dispute regarding the objective reasonableness of the defendant's conduct in light of the law and the facts known to the defendant at the time. *Id.* Lastly, if the facts are undisputed, and the defendant could be found to have acted reasonably if the conduct is viewed objectively, then summary judgment must be granted for the defendant. *Id.*

 For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing is a violation of that right. Although the defendant bears the initial burden of coming forward with facts to suggest he was acting within the scope of his discretionary authority, the plaintiff must demonstrate that the law allegedly violated was clearly established. *Id.* If the plaintiff can show that the defendant's conduct as described by the plaintiff violated clearly established law, then it is the defendant's burden to demonstrate that no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and the information the defendant had at the time of his actions. *Id.*

### 2. Invalid Warrants

The plaintiff argues that the two search warrants were invalid because they were addressed to city police officers and yet the police officers had no jurisdiction[3] to leave the city to serve the warrants. I assume that the warrants were invalid for the reason

---

**2.** To the extent that the plaintiff argues that warrants were not based upon affidavits establishing probable cause, and therefore the defendants are not entitled to the defense of qualified immunity, I disagree. My independent review of the affidavits establishes that a reasonable law enforcement officer could have objectively believed that the affidavits established arguable probable cause for issuance of the warrants. In such a case, the defendants are entitled to qualified immunity even if no probable cause for the warrants actually existed. *See, e.g., Walden v. Carmack,* 156 F.3d 861, 872 (8th Cir.1998) (Even if a search warrant had been issued without a proper finding of probable cause, given the specific information contained in the search warrant affidavit, "it would have been objectively reasonable for the officers executing the search warrant to have relied on the issuing judge's determination that probable cause existed.") (citations omitted).

**3.** The parties agree that police officers have jurisdiction outside the city limits under certain circumstances. They also agree that none of those circumstances exist in this case.

articulated by the state judge—they were addressed to law enforcement officers who had no jurisdiction to execute them because the premises to be searched was outside the city limits. Nevertheless, the law enforcement officers have qualified immunity from suit because they relied upon the warrants and their reliance was objectively reasonable under federal law.

■ A search warrant may be deficient under state law. However, a state law deficiency that does not also violate federal constitutional norms will not make reliance on the warrant objectively unreasonable for qualified immunity purposes if the warrant and its execution are otherwise valid. *See, e.g., Schwartz v. Pridy,* 94 F.3d 453, 457 (8th Cir.1996) (even if special agent for the Criminal Investigations Bureau of the Missouri Department of Revenue had no authority to apply for warrant under Missouri law, the special agent was nevertheless · entitled to qualified immunity when he stated his official position in his affidavit) (citing and quoting *United States v. Freeman,* 897 F.2d 346, 350 (8th Cir.1990)) (" 'stating that no constitutional violation occurred when an unauthorized officer who was acting in good faith obtained a search warrant that was otherwise valid.' ").

■ Here, the state law deficiency did not violate federal constitutional norms and the warrants and the execution of them were "otherwise valid." Both warrants were based upon arguable probable cause and both were executed with the assistance of law enforcement officers who plainly had the power to apply for and serve them. Still further, it is undisputed that the police officers disclosed on the face of the affidavits that they were city police officers. Moreover, even though he might not have recognized the significance of the point, the issuing judge knew the plaintiff's true address was "1702 North 37th Street, Norfolk, *Madison County,* Nebraska" and he authorized the search of that residence. (Filing 70, Exs. 4 & 6) (Emphasis added). Still further, both warrants empowered the police officers to secure the assistance of other law enforcement officers, and that is exactly what they did.

As a result, I find and conclude that the police officers, the deputy sheriffs, and the state trooper acted in objective good faith when they relied upon the warrants. This is true even if the warrants were technically invalid under Nebraska law because the wrong officer applied for and helped [4] execute the warrants. In an effort to avoid this result, the plaintiff asserts a number of arguments. Only two, however, merit a response.

The plaintiff initially argues that Nebraska law was clearly established that a police officer could not execute a warrant outside the city limits even with the assistance of other authorities who had jurisdiction. There are two responses to that assertion. First, the pertinent question is whether a reasonable officer would have believed he or she was · violating *federal* law, and, at least where technical violations are involved, state law tells us very little about violations of federal law as *Pridy* and *Freeman* make clear. Second, the plaintiff's premise is incorrect; that is, Nebraska law was not clearly established. For example, the most analogous Nebraska case [5] has no value as precedent,[6] was based upon distinguishable facts,[7] and the author of the opinion acknowledged that the law was unsettled.[8]

Next, the plaintiff argues that a violation of state law may also constitute a violation of

---

4. The situation might be different if the only officer involved was one who had no arguable jurisdictional power to apply for and execute the warrant.

5. *State v. Whited,* 1 Neb.C.A. 1598, 1992 WL 231620 (Neb.App.1992) (unpublished decision; one judge).

6. *See* Neb.Ct.R. of Prac. 2E (1999 Ed.).

7. A city police officer from one city went to another city in another county and obtained a search warrant for execution in the second city.

8. "Some states' appellate courts have ruled that even though a search warrant is issued to and executed by a law enforcement officer that has no authority to do so, such does not require suppression of the evidence obtained by the search if officers with territorial jurisdiction were present." *Whited,* 1992 WL 231620 at *5 (citations omitted).

federal law. In support, the plaintiff cites *Bissonette v. Haig*, 800 F.2d 812 (8th Cir. 1986) (en banc), *aff'd* 485 U.S. 264, 108 S.Ct. 1253, 99 L.Ed.2d 288 (1988), and other cases, for the proposition that "[n]ot only federal law, but also state law, can be relevant in determining what is reasonable under the Fourth Amendment." *Id.* at 815. While I do not disagree with the plaintiff's proposition, it is not applicable. Because our precedents require me to characterize the state law violation as merely technical, the fact that an unauthorized officer obtained and executed a valid search warrant with the help of authorized officers does not implicate the Fourth Amendment or bar the defense of qualified immunity. *See, e.g., Pridy,* 94 F.3d at 457; *Freeman,* 897 F.2d at 350.

### 3. Seizure Beyond the Scope of Warrant

Since the warrant that was served on January 25, 1996, did not authorize the seizure of stolen items, the plaintiff argues that the law enforcement officers violated the Fourth Amendment when they seized the stolen property.[9] Once again, the defendants urge the defense of qualified immunity, and I agree that they are entitled to that defense. There was no violation of a clearly established constitutional right because the defendants lawfully seized the stolen items pursuant to the "plain view doctrine."

■■■ The "plain view doctrine" authorizes officers to seize items without a warrant when three circumstances are present. *See, e.g., United States v. Weinbender,* 109 F.3d 1327, 1330 (8th Cir.1997). Those circumstances are: (1) the officer did not violate the Fourth Amendment in arriving at the place from which evidence could be plainly viewed; (2) the object's incriminating character is immediately apparent; and (3) the officer has a lawful right of access to the object itself. In particular, the plain view doctrine applies to items that may be "stolen property." *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). With these factors in mind, I turn to the facts.

■■■ First, the officers entered the home with a warrant. For the reasons earlier stated, neither the warrant nor the execution of it violated the Fourth Amendment. Thus, the officers did not violate the Fourth Amendment when arriving at the place from which the evidence could be plainly viewed.

Second, it was immediately apparent that the items had been stolen. The cordless phone looked like the one that had been stolen and the serial number matched. One of the cigarette lighters had initials that matched a lighter that had been stolen. The female clothing and undergarments were distinctive given the burglary reports, the plaintiff's gender, and his past conviction for thefts involving women's underwear.

Third, the officers had a lawful right of access to the objects themselves. The officers were authorized to search throughout the home for "bank and business records, copies of bank drafts, and other records related to transactions with Gordon Kosobucki." The places the officers searched within the home were reasonably related to the command of the search warrant. In particular, the search of the duffel bag in the plaintiff's bedroom for Kosobucki-related documents was within the ambit of the warrant. *See, e.g., Weinbender,* 109 F.3d at 1330 (plain view doctrine permitted officer, who was searching for clothing pursuant to a search warrant, to seize silencer which he observed after removing loose pieces of drywall and wood from closet wall).

The plaintiff tries to avoid the "plain view" doctrine by arguing the search warrant was a pretext to search for stolen items. I reject this argument because it is factually unsupported and legally unsound.

The plaintiff has stated in the unsworn complaint executed by his lawyer that the Madison County Attorney told him "that the search warrant was a ruse to get into the house and see what the officers could find." (Filing 74 ¶ 33.) This conversation allegedly occurred at the police station and it was videotaped. (*Id.*) However, the county attorney has denied the allegation under oath

9. To the extent that the plaintiff also vaguely implies (Filing 89, Ex. 1 ¶ 9) that the officers seized records that were unrelated to the fraud investigation and the search warrant, I reject the argument as factually unsupported. For example, the plaintiff does not describe the records.

(Filing 86, Ex. 3 ¶ 15), the video tape does not corroborate the plaintiff's claim (Filing 86, Ex. 3B), and the plaintiff has not given a sworn affidavit that repeats the unsworn allegation of his complaint (Filings 64, 76, 89.) Accordingly, there is no genuine dispute of fact on this point and I reject the allegation as factually unsupported. Fed.R.Civ.P. 56(e) (a party may not rest upon the mere allegations of his or her pleadings).

■ Moreover, the Supreme Court has held that "inadvertence" is not a requirement for proper use of the "plain view" doctrine. *Horton v. California*, 496 U.S. 128, 133–42, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). As a result, the Fourth Amendment was not violated even if the officers expected to find other incriminating evidence when executing the search warrant.

■ Still further, "an officer's subjective beliefs are not relevant to qualified immunity analysis." *Bridgewater v. Caples*, 23 F.3d 1447, 1449 (8th Cir.1994) (even though arresting officer did not believe he had probable cause to make arrest, he was entitled to qualified immunity because a reasonable officer could have believed that he had probable cause to do so.) Therefore, the officers' hope of finding incriminating evidence of another crime when executing the search warrant does not preclude the qualified immunity defense.

## B. Counts II & IV

### Wrongful Seizure of Person

### January 25 & January 30, 1996

■ The plaintiff claims that the law enforcement defendants arrested him without a warrant on January 25, 1996, and January 30, 1996, and therefore they violated his Fourth Amendment rights.[10] The arresting officers respond that they have qualified immunity for these claims, and I agree. All the officers could have objectively and reasonably believed that they had authority to make the warrantless arrests.

As earlier stated, both on January 25, 1996, and on January 30, 1996, the law enforcement officers had a right to be in the plaintiff's home. On each occasion, the defendants had a search warrant. Although the warrants were technically deficient, they were "otherwise valid." The execution of the warrants was also valid. In addition, the deputy sheriffs and the trooper, who were within their geographic jurisdiction, had the power to make warrantless arrests for burglary. Neb.Rev.Stat. § 29–404.02(1) (Michie 1995) (a "peace officer may arrest a person without a warrant if the officer has a reasonable cause to believe that such person has committed [a] felony.")

■ Thus, the question for qualified immunity purposes is whether there was arguable probable cause to make a warrantless felony arrest. *See, e.g., Greiner v. City of Champlin*, 27 F.3d 1346, 1353 (8th Cir.1994) (officers had qualified immunity for warrantless arrest in residence when officers arguably had probable cause to believe residents had violated the law and the officers had a right to enter the home because of arguable exigent circumstances).[11] Here, reasonable officers could have believed that they had probable cause to arrest the plaintiff on both occasions. A brief examination of the undisputed facts known to the officers prior to the arrests makes this point evident.

**10.** To the extent that the plaintiff argues that his *Miranda* rights were violated because the officers did not stop an interrogation when he asked to consult a lawyer, I note that such a claim is not actionable in a § 1983 action. *See, e.g., Warren v. City of Lincoln*, 864 F.2d 1436, 1442 (8th Cir.), *cert. denied*, 490 U.S. 1091, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989) ("[T]he remedy for a *Miranda* violation is the exclusion from evidence of any compelled self-incrimination, not a § 1983 action.") In addition, the plaintiff does not claim to have given any incriminating information to the police and he admits (Filing 74 ¶¶ 31 & 35) that he was allowed to call his lawyer and the lawyer ultimately came down to the police station. Thus, the plaintiff was not harmed by the claimed violation of any Fifth or Sixth Amendment rights.

**11.** Although frequently confused, the question in a qualified immunity case is not whether the defendant had probable cause to arrest, but whether a reasonable officer could have believed that he or she had probable cause. The latter concept is sometimes called "arguable probable cause." *Id.* at 1353 (citing *Myers v. Morris*, 810 F.2d 1437, 1455 (8th Cir.), *cert. denied*, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987)).

On the first occasion and before making the warrantless arrest for burglary: (1) the officers had reports of burglaries and the reports specifically identified items which had been taken; (2) the officers knew that the plaintiff had been convicted of crimes in which one of his "signatures" was taking female undergarments and clothing; (3) in plain sight, in the home where the plaintiff was found, the officers observed a cordless phone that matched the serial number of a stolen phone; (4) in plain sight, in the plaintiff's bedroom, the officers found a cigarette lighter that contained initials identical to one that had been stolen; and (5) in plain sight, in the plaintiff's bedroom, the officers located numerous of items of female clothing.

On the second occasion, the officers knew before making the warrantless arrest that: (1) from police reports, a law firm had been burglarized; (2) a computer and licensed program had been stolen from the firm; (3) the plaintiff was a prime suspect in other recent burglaries and he had a criminal record for theft; (4) a similar computer, with a program licensed to the victim law firm, had earlier been observed in the plaintiff's home; (5) the plaintiff had earlier told the authorities that he had "borrowed" the computer program licensed to the victim law firm and the computer belonged to his father; (6) when they entered the home pursuant to a search warrant, the officers found the plaintiff in the home with a computer; and (7) the computer matched the description of the stolen computer, the serial number had been removed from the machine, and the plaintiff's father denied ownership of the machine.

In sum, because of the warrants, I find that the officers had a right to be in the plaintiff's home on the two occasions when they arrested him for burglary. On both occasions, they had arguable probable cause to believe the plaintiff was guilty of the felony crime of burglary and some of them had authority to make a warrantless arrest. As a result, all the officers have qualified immunity from suit on the plaintiff's claim that his arrests violated the Fourth Amendment. *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (even though criminal complaint was subsequently dismissed on motion of the government, secret service agents, who "'reasonably but mistakenly conclude[d] that probable cause [was] present'" when they made a warrantless arrest of the plaintiff in his home, were entitled to qualified immunity) (quoting *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). *See also Warren,* 864 F.2d at 1440–41 (police officers had probable cause to arrest the plaintiff for suspicion of burglary when police knew that: (a) a slender white male in early twenties with white, short sleeved shirt had tried to force open window of second floor apartment; (b) the victim witnessed the intruder running to the east; (c) a tracking dog lead police to plaintiff's car some four and one-half blocks east of the crime; (d) the plaintiff matched description of intruder and began to drive away as the police approached.)

The plaintiff tries to avoid the foregoing analysis by essentially repeating his argument on the search warrants; that is, he claims that he was technically arrested by the city police officers who were outside their jurisdiction. He adds that the deputy sheriffs and state trooper are liable because they assisted the police in these unlawful arrests. Thus, he contends that even if the officers had probable cause to arrest him, the arrests were unlawful because the city officers had no technical authority to make an arrest outside of their jurisdiction.

Assuming that the city police officers made the arrests and that they had no jurisdictional authority to do so, it is also undisputed that they had the help of their county and state colleagues when taking the plaintiff into custody. It is further undisputed that all "peace officers" have authority to make warrantless felony arrests in Nebraska. It is additionally undisputed that the deputy sheriffs and the state trooper in fact had the jurisdictional authority to arrest the plaintiff. Therefore, all the officers could have reasonably believed that as a group they had the lawful collective power to seize or assist in the seizure of the plaintiff. As a result, even if the arrests were made by a police officer who technically lacked authority, the active assistance of other officers, who had authority to make the arrests, renders the actions of

all the officers objectively reasonable for qualified immunity purposes. *Compare Abbott v. City of Crocker, Mo.,* 30 F.3d 994, 998 (8th Cir.1994) (the fact that a single officer had no authority to effect arrest outside city limits for traffic offense did not establish as a matter of law that the arrest also constituted violation of the Fourth Amendment; holding that the district court erred in granting judgment as a matter of law in favor of the plaintiff).[12] *Cf. Pridy,* 94 F.3d at 457; *Freeman,* 897 F.2d at 350.

The plaintiff correctly argues that in *Cole v. Nebraska State Bd. of Parole,* 997 F.2d 442, 444 (8th Cir.1993) the Court of Appeals stated: "An arrest by a state actor that is not authorized by state law is actionable under § 1983 as a seizure contrary to the Fourth Amendment." *Id.* However, in the portion of *Cole* relied upon by the plaintiff, the Court of Appeals was dealing with the district court's ruling that Cole had failed to state a claim. *Id.* The Court of Appeals was not ruling upon the granting of a motion for summary judgment based upon the defense of qualified immunity. Indeed, the court emphasized that: "On this state of the record, of course, there is no basis to conclude what [the arresting officer] reasonably believed, if anything, with respect to the relevant matters." *Id.* Accordingly, *Cole* does not negate the defense of qualified immunity raised by the defendants in this case.

### C. Counts V, VI, VIII & IX

### Failure to Train or Supervise

In these counts the plaintiff claims that Sheriff Hjorth and Chief Mizner in their official capacities failed to properly "train and supervise" their deputies and officers "regarding the serving of search warrants and the arrest and detention of suspects." (Filing 74, ¶¶ 79 & 81.) The plaintiff also alleges that the City of Norfolk and Madison County are liable for the failure to train or supervise presumably because the Chief and the Sheriff established a policy or custom or practice of failing to train or supervise. (Filing 74 ¶¶ 85 & 87.) The defendants assert

that there are no material facts in dispute, and there is no basis for concluding that any action or inaction in training or supervision caused the plaintiff harm. I agree with the defendants.

 At most, the undisputed facts show that the trooper, the deputy sheriffs and the police officers made reasonable, but mistaken, judgments. There is no evidence that anything the supervisory defendants did or failed to do would have prevented the plaintiff from suffering the harm he claims to have suffered. This is especially true since, as demonstrated earlier, the law in Nebraska was unsettled about the extraterritorial jurisdictional authority of city police officers who are aided by sheriffs and state troopers. No amount of training or supervision could have made Nebraska's law clear. Therefore, summary judgment must be granted for Hjorth, Mizner and the respective political subdivisions because there is no causal link between the failure to train or supervise and the plaintiff's alleged injury. *See, e.g., Tilson v. Forrest City Police Dept.,* 28 F.3d 802, 808–09 (8th Cir.), *cert. denied,* 514 U.S. 1004, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995) (even though the plaintiff was incarcerated for 14 months without being charged, even though the chief of police knew the plaintiff had been incarcerated, and even though the chief of police had not promulgated any written procedures to guide criminal investigations, the plaintiff was required to prove that the chief of police's lack of action caused the constitutional deprivation; reversing district court refusal to grant judgment as a matter of law; instructing the district court to enter judgment for chief of police and city).

### D. Count VII

### County Attorney's Knowledge of Pretext

The plaintiff asserts that he is entitled to damages against the county attorney because of the "failure of defendant Joseph Smith, knowing that the search of January 26, 1996(sic), was only a pretext for a search of the plaintiff's residence for items not on the

---

**12.** For the reasons articulated by Judge Arnold in his dissent, it might be a different story if a police officer, outside his jurisdiction, made an arrest without the help of officers who had jurisdictional authority. *Abbott,* 30 F.3d at 1000.

search warrant, and failing to take any steps to prevent these illegal actions." (Filing 74 ¶ 83.) The plaintiff also asserts in that unsworn complaint that Smith told him "that the search warrant was a ruse to get into the house and see what the officers could find." (Filing 74 ¶ 33.) Smith responds by asserting, among other things, the qualified immunity defense.

 I agree that Smith has qualified immunity. I have previously explained that: (1) there is no factual basis for the plaintiff's claim that Smith admitted that the warrant was a "ruse"; (2) even if the officers hoped to find other incriminating evidence when executing the search warrant, such an expectation is not actionable if, as is the case here, the officers complied with the "plain view" doctrine; and (3) the subjective belief of the actors is not relevant for qualified immunity purposes. Pt. II. A.3. These things being true, Smith is entitled to qualified immunity.

### III. CONCLUSION

The motions for summary judgment will be granted on all the federal claims. To the extent that the plaintiff asserts claims founded on state law, I will dismiss those claims without prejudice because I decline to exercise supplemental jurisdiction over them now that all the federal claims have been resolved. 28 U.S.C. § 1367(c)(3).

IT IS ORDERED that the motions for summary judgment (Filing 54, 69, 77, 78, 79, 80, 81) are granted and judgment will be entered by separate document dismissing this case.