### Mark D. SIEGEL, Plaintiff

v.

### Drew MILLER et al., Defendants.

### No. 05–CV–466.

United States District Court,
E.D. Pennsylvania.

Aug. 18, 2006.

---

J. Michael Considine, Jr., West Chester, PA, for Plaintiff.

Joseph J. Santarone, Jr., Marshall Dennehey Warner Coleman & Goggin, King of Prussia, PA, for Defendants.

### EXPLANATION AND ORDER

ANITA B. BRODY, District Judge.

Plaintiff Mark D. Siegel ("Siegel") brings this suit against defendants, officers of the Upper Merion Police Department, alleging false arrest, malicious prosecution, and violation of his first amendment rights, all under § 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983 (" § 1983"). Jurisdiction is appropriate based on the exis-

tence of a federal question pursuant to 28 U.S.C. § 1331.

Siegel alleges that Officers Drew Miller ("Miller"), Brennan Dougherty ("Dougherty"), and Edward McGinley ("McGinley") arrested him without a warrant or probable cause, and initiated criminal proceedings against him maliciously and without probable cause.[1] Currently before me is defendants' Motion for Partial Summary Judgment (Doc. # 33). In their motion, Officers McGinley and Dougherty assert that they are entitled to qualified immunity because they were justified in responding to Officer Miller's call for back-up assistance, and were not directly involved in the arrest and prosecution of Siegel. For the reasons that follow, defendants' motion is granted.

## A. FACTUAL BACKGROUND

This case arises from interactions between Siegel and the defendants on two dates. There are factual discrepancies in the parties' accounts of each incident.[2] According to Siegel, on March 12, 2004[3] he was coming home from work when two people in a pickup truck pulled out of the Upper Merion police station right in front of him, causing him to slam on his brakes. (Siegel Dep. at 55–56, 58.) He later learned that Miller was in the pickup truck.[4] (Id. at 57.) After the two cars proceeded down the road, Siegel pulled up alongside the pickup truck, "gave them the finger," and then made a right turn while the pickup truck made a left.[5] (Id. at 58–59.) No words were exchanged. (Id. at 61.) Siegel said he had never spoken with any of the defendants before the date of this incident. (Id. at 62.)

The next encounter between Siegel and Miller occurred roughly two weeks later. On March 26, 2004[6] Siegel claims that he was driving with John Golden ("Golden"), an acquaintance from work, when he stopped at his parents' house to drop something off and saw Officer Miller sitting in an unmarked vehicle across the street. (Siegel Dep. at 74–77.) When Siegel came out of his house, he pulled his car up alongside Miller's, told Miller that his lights were on and that he was violating Siegel's civil rights, and said "how would you like it if I sat in front of your house?" (Id. at 78–31.) Siegel did not respond when Miller asked whether Siegel was

1. All claims against Officer Declan Coyle ("Coyle") were dismissed on February 27, 2006 (Doc. # 55.) Siegel claims that Miller alone violated his First Amendment right to complain about the police by arresting Siegel in retaliation for protected expression, and Miller has not moved for summary judgment.

2. Because the facts must be considered in the light most favorable to the non-moving party, I will present the facts according to Siegel and footnote the places where the defendants' accounts differ from his. Facts that are only relevant to Siegel's claims against Miller are not relevant to this motion and are not included here.

3. In his original complaint and at his deposition, Siegel identified this date as July 21st, 2004, but replaced the date with March 12,

2004 in his Amended Complaint (Doc. # 27). Miller's Incident Report Form states that this incident occurred on March 4, 2004. (See Pl.'s Mot. for Summ. J. Ex. 13.)

4. Officer Coyle was his passenger. (Coyle Dep. at 17.)

5. Miller denies that his vehicle cut off Siegel's that day. (Id. at 11–12.) According to Miller, Siegel's vehicle was in front of his, then slowed down and moved into the right-hand lane. When Miller and Coyle passed by in the left-hand lane, Siegel was laughing and looking out his window at them, and as they approached a red light he gave them the finger. (Id. at 10–11.)

6. In his original complaint, Siegel identified this date as August 4, 2004. (Doc. # 27.)

threatening him, but instead drove off with Golden. (*Id.* at 78–79.)

Then, according to Siegel, he "made a bunch of turns," and Miller continued to follow him for a period of twenty minutes to half an hour, with no sirens or lights.[7] (Siegel Dep. at 84, 86.) Siegel recalls that he was driving in circles to see why Miller was following him. (*Id.* at 86.) Golden testified at his deposition that Siegel's car never followed Miller's, never exceeded the speed limit, traveling at no more than 35 miles per hour "at the most," and never violated any traffic laws. (Golden Dep. at 18–19.)

After about twenty minutes, Siegel pulled over to the side of the road, got out of his car and asked Miller if he was being detained. (Siegel Dep. at 89–90.) According to Siegel, Miller, who did not get out of his car, "laughed, went ha, ha, yeah," in response. (*Id.* at 89.) Siegel recalls that he said "yeah, right" as if it were a joke, got back in his car, and went on his way, using turn signals and observing the speed limit.[8] (*Id.*)

Miller then made a radio call for assistance, stating that Siegel was traveling at a high rate of speed through a residential neighborhood, and that he would like a marked police car to stop him.[9] (Coyle Dep. at 11.) Coyle arrived first, positioning his car halfway across the road to stop Siegel's car. (*Id.* at 6.) The other defendants arrived soon after. At his deposition, Siegel testified that "a big undercover cop" ran out and put a gun to Golden's head,[10] while Miller opened Siegel's door and pulled him out of the car.[11] (Siegel Dep. at 94; Coyle Dep. at 8.) Miller's deposition testimony is that he asked Siegel to exit the vehicle, Siegel complied

---

7. Miller disputes this account, saying that he did not follow Siegel at first, but began to do so when Siegel came out behind Miller and followed him in the same spot where he had previously given Miller the finger, and then failed to come to a complete stop at the red light. (Miller Dep. at 48.) Miller also said that Siegel "was driving at excessive rates of speed," probably 45 to 50 miles per hour. (*Id.* at 52–53.)

8. According to Miller, when Siegel asked if he was being detained, Miller replied "yes, you are, wait for a marked unit." (Miller Dep. at 61.) Miller explained this instruction by saying that he was in plain clothes in an unmarked car, and it is better if a marked car with a uniformed officer makes a vehicle stop or detains a suspect. (Miller Dep. at 63.)

9. Dougherty testified only that Miller stated he needed an unmarked vehicle to initiate a traffic stop for him. (Dougherty Dep. at 11.) He did not recall whether Miller said that Siegel's vehicle had exceeded the legal speed limit or had violated a traffic law. (*Id.* at 17.) McGinley first testified that Miller "simply asked for a marked vehicle to make a vehicle stop," but then stated "I believe the radio communication was that Mr. Siegel had been

speeding or something and went through a red light, something to that effect." (McGinley Dep. at 7–8.) The dispatch record said that Miller requested a unit in the area to stop Siegel because he had threatened an officer and was driving in a residential neighborhood at a high rate of speed. (Pl.'s Mot. for Summ. J. Ex. 11.) The next entry in the dispatch record was that Siegel got out of his vehicle, then got back into it and left after being told that he was being detained. (*Id.*)

10. In defendants' answers to interrogatories, they specifically deny that any guns were pointed at Golden during the stop. (Def.'s Resp. to Pl.'s Inter. No. 8, Pl.'s Mot. for Sum. J. Ex. 8.) Their deposition testimony supported the interrogatory answer. (*See* Dougherty Dep. at 12–13; McGinley Dep. at 11–13; Miller Dep. at 65.) In any event, Siegel did not include a claim of excessive force in his complaint, although his brief in response to this motion is focused on the claim that pointing guns at the stop constituted excessive force. (*See* Pl.'s Resp. to Def.'s Mot. for Part. Summ. J.)

11. Golden also testified that Siegel stepped out of the car on his own. (Golden Dep. at 47.)

without resistance, and then Miller handcuffed him. (Miller Dep. at 65–66.) Siegel did not see any weapons pointed at him. (Siegel Dep. at 97.) At his deposition, Golden identified the officers who pointed guns at him as McGinley and Dougherty. (Golden Dep. at 11–13.) Golden never saw a gun pointed at Siegel. (*Id.* at 53.)

The officers who responded to Miller's radio call did not observe Siegel make any effort to escape the police, or commit any crime that day.[12] (Coyle Dep. at 7–8; McGinley Dep. at 14–15.) The officers searched Siegel, placed him in handcuffs, and put him in the back of a police car. (Siegel Dep. at 95.) Miller testified that he was the one who asked Siegel to exit the vehicle and who then placed Siegel in handcuffs. (Miller Dep. at 65–66.) After Siegel sat in handcuffs in the back of the police car for approximately four minutes, Coyle drove Siegel to the Upper Merion police station. (Siegel Dep. at 98; Coyle Dep. at 13.) Siegel recalls that he asked an officer in the car why he was being arrested and did not get an answer. (Siegel Dep. at 98–99.)

Coyle took Siegel to the station's processing room and relinquished custody of

him. (Coyle Dep. at 14.) Siegel testified that he was searched "four times at least" at the police station and was told that he smelled like pot. (Siegel Dep. at 99.) Siegel did not identify McGinley or Dougherty as the officers who searched him. According to Siegel, when he asked Miller why he was going to jail, Miller said "Because you gave me the finger two weeks ago and I wrote a report up about it."[13] (*Id.*) Siegel then apologized for giving Miller the finger. (Siegel Dep. at 104; Miller Dep. at 78.) Siegel testified that after a couple of hours, including a period where Siegel was handcuffed and sitting in a chair, an unidentified officer drove him back to his car.[14] (*Id.* at 105, 108.) Miller wrote Siegel citations for harassment and disorderly conduct, which Siegel received on the way out of the station.[15] (Siegel Dep. at 106, 109.)

Siegel received a hearing date for the citations, paid a hundred dollars, and pleaded not guilty. (Siegel Dep. at 110.) No officers from the Upper Merion Police Department appeared at his hearing. (*Id.* at 122.) The judge continued the hearing and when no officers appeared at the sec-

---

**12.** Coyle explained that four officers responded to the scene because two of the cars were unmarked and they prefer to use a marked car to stop a vehicle, "coupled with the fact that Mr. Siegel did wrestle with officers in the past." (Coyle Dep. at 29.)

**13.** Miller denies saying this. (Miller Dep. at 79.)

**14.** According to Miller, Siegel was only put in the cell for a five to fifteen minutes until he could write a citation, and was not in handcuffs in the cell. (Miller Dep. at 66–67, 91.)

**15.** On the citation for harassment, Miller wrote that "Defendant engaged in a course of conduct and repeatedly committed an act which served no legitimate purpose." On the citation for disorderly conduct, he wrote that

"Defendant created a hazardous and physically offensive condition by any act which served no legitimate purpose." (*See* Pl.'s Mot. for Summ. J. Ex. 12.) At Miller's deposition, he testified that he considered Siegel's slowing down, singling him out and giving him the finger to be harassment. (Miller Dep. at 42–43.) He also explained his belief that Siegel committed a crime based on

> [t]he fact that he chose me, he picked me out for no other reason other than I am a police officer for the Upper Merion Township Police Department, on the first day. And secondly, the fact that he followed me and threatened to go to my house, coupled all together is a crime.

(Miller Dep. at 84–85.) He testified that he was concerned about his family's safety, and that Siegel would come and do some violent act at his house. (*Id.* at 86.)

ond date, the case was dismissed. (*Id.* at 122, 137–38.)

## B. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted "if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." *Kornegay v. Cottingham*, 120 F.3d 392, 395 (3d Cir.1997). A factual dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In order to survive summary judgment, a plaintiff must make make a showing "sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must draw all reasonable inferences in the non-moving party's favor. *Matsushita Elec., Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## C. DISCUSSION

Defendants McGinley and Dougherty assert that they are entitled to qualified immunity on Siegel's false arrest and malicious prosecution claims against them, and that the claims should be dismissed with prejudice. Analysis of each of Siegel's claims in the light most favorable to him yields the same conclusion.

 Qualified immunity excuses government officials and employees from standing trial where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The purpose of qualified immunity for public officials "is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway*, 510 U.S. 510, 514, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) (quoting *Harlow*, 457 U.S. at 806, 102 S.Ct. 2727). In considering claims of qualified immunity, courts must be mindful of "'[t]he broad range of reasonable professional judgment accorded' law enforcement officials in the § 1983 context." *Berg v. County of Allegheny*, 219 F.3d 261, 272 (3d Cir.2000) (quoting *Greene v. Reeves*, 80 F.3d 1101, 1107 (6th Cir.1996)).

 The analysis of whether a party merits qualified immunity "requires a two-step inquiry." *Williams v. Bitner*, 455 F.3d 186, 190 (2006). The first question is whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If no constitutional right would have been violated, the inquiry ends there. *Id.* If a constitutional violation could be made out based on plaintiff's evidence, "the next, sequential step is to ask whether the right was clearly established." *Id.* "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

### 1. The False Arrest Claim

To establish liability in a § 1983 suit, Siegel must prove that he "has been de-

prived of a right 'secured by the Constitution and laws.'" *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (quoting 42 U.S.C. § 1983). Here, Siegel claims that defendants' alleged false arrest of him violated his Fourth Amendment right to be free of unreasonable searches and seizures. The Third Circuit has explained that "[t]he proper inquiry in a § 1983 claim based on false arrest or misuse of the criminal process is not whether the person arrested in fact committed the offense, but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Dowling v. City of Philadelphia,* 855 F.2d 136, 141 (3d Cir.1988).

▮ It is generally reasonable to stop an automobile "where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). If officers stop someone on the basis of information supplied by another officer, the government must show "that the officer who issued the radio bulletin had reasonable suspicion, not simply that it was reasonable for the arresting officer to have relied on the bulletin." *United States v. Coward,* 296 F.3d 176, 180 (3d Cir.2002). According to the officers in this case, Miller made a radio call for marked cars to stop Siegel's car because it was traveling at a high rate of speed through a residential neighborhood. (Coyle Dep. at 11; Dougherty Dep. at 11; McGinley Dep. at 7–8.) To the extent that McGinley and Dougherty participated in Siegel's arrest at all, they did so on the basis of information provided by Miller. Both Siegel and his passenger Golden have testified that Siegel did not violate any traffic laws that afternoon. (Siegel Dep. at 89; Golden Dep. at 18–19.) Because

Siegel has produced evidence that Miller did not have probable cause to stop him for a traffic violation, a jury could find that McGinley and Dougherty's participation in Siegel's stop and arrest violated Siegel's constitutional rights.

Having determined that the facts taken in the light most favorable to Siegel support a finding that the officers violated his constitutional rights, it is necessary to proceed to the second step. In the context of a false arrest claim under § 1983, the Third Circuit has described the second inquiry as whether "a reasonable officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information in the officer's possession." *Berg v. Allegheny,* 219 F.3d 261, 272 (3d Cir.2000) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam)). Thus even if Miller's radio call was made in the absence of reasonable suspicion that Siegel had committed any crime or violation, McGinley and Dougherty's conduct must be judged based on the facts within their knowledge after they heard the radio call.

▮ The law in this Circuit instructs that "where a police officer makes an arrest on the basis of oral statements by fellow officers, an officer will be entitled to qualified immunity from liability in a civil rights suit for unlawful arrest provided it was objectively reasonable for him to believe, on the basis of the statements, that probable cause for the arrest existed." *Rogers v. Powell,* 120 F.3d 446, 455 (3d Cir.1997). It was objectively reasonable for McGinley and Dougherty to believe, based on Miller's statement that Siegel was traveling through a residential neighborhood at a high rate of speed, that there was reasonable suspicion to stop him.[16]

---

**16.** The uncontroverted evidence in this case is

that Miller actually removed Siegel from the

Therefore the officers are entitled to qualified immunity on Siegel's false arrest claim against them.

## 2. The Malicious Prosecution Claim

 To prevail on a malicious prosecution claim under § 1983 against McGinley and Dougherty, Siegel must at least allege that the officers initiated a criminal proceeding against him. *Estate of Smith v. Marasco,* 318 F.3d 497, 521 (3d Cir.2003). In addition, "a plaintiff claiming malicious prosecution must be innocent of the crime charged in the underlying prosecution." *Hector v. Watt,* 235 F.3d 154, 156 (3d Cir.2000). It is undisputed in this case that Miller initiated a criminal proceeding against Siegel by issuing him citations for disorderly conduct and harassment. There is no evidence that either McGinley or Dougherty were involved in initiating or pursuing the citations against Siegel. Therefore the officers are entitled to summary judgment on Siegel's malicious prosecution claim against them.

## D. CONCLUSION

For the foregoing reasons, McGinley and Dougherty are entitled to summary judgment on the basis of qualified immunity on both the false arrest and the malicious prosecution claims, and the claims are dismissed with prejudice. An appropriate order follows.

### *ORDER*

AND NOW, this __ 18th _____ day of August, 2006, it is **ORDERED** that Defendants' Motion for Partial Summary Judgment (Doc. # 33) is **GRANTED** and plaintiff's Complaint as against defendants Dougherty and McGinley is **DISMISSED** **WITH PREJUDICE.** Plaintiff's claims shall proceed against defendant Miller only.

car and placed him in handcuffs. (Miller Dep. at 65–66.) Coyle, who has been dismissed from the case, drove Siegel to the police station, where Miller wrote up the citations. (Coyle Dep. at 13–14; Miller Dep. at 66–67.) The evidence most favorable to Siegel tends to show only that McGinley and Dougherty participated in his traffic stop.