KEARSE, Circuit Judge,
dissenting in part:
I respectfully dissent from so much of the majority’s opinion as rules that “[t]he trial record establishes” “as a matter of law,” Majority Opinion, ante at 94, 99, that the defendant detectives, most of them from the New York City Police Department’s 72nd Precinct (or “Precinct”), who arrested plaintiff Eli Samuel Figueroa (“Samuel”) on a charge of endangering the welfare of a child, are entitled to qualified immunity with respect to Samuel’s false arrest claims, on the basis that a reasonable law enforcement official in their position could have concluded that there existed probable cause to arrest Samuel on the night of June 30, 2010, giving them “arguable” probable cause. My disagreement has several sources, among them the following: First, the record in this case shows that the defendants’ relevant knowledge consisted not just of their observations of the Duane Reade photographs of a nude boy on June 29 but rather included repeated complaints about suspected sexual abuse of the boy, complaints made by Samuel and the boy’s mother Shirley Saenz (“Saenz”) to the police department — beginning at the 72nd Precinct — over the preceding two weeks. Second, the majority opinion does not, although it claims to, “view the facts in the light most favorable to Samuel,” id. at 94 n.l, which is required in awarding his opponents judgment as a matter of law. Third, the majority appears to ignore the fact that it is granting judgment as a matter of law on the basis of qualified immunity, an affirmative defense. In taking issue with this dissent, the majority focuses on “Samuel’s ... false arrest claims” and the evidence “Samuel ... offered ... to support them” and states, “our analysis of Samuel’s false arrest claims does not take account of evidence— such as a series of written reports from a Detective Hawkins concerning Saenz’s mid-June complaint to police — that was never put before the jury,” Majority Opinion at 98 n.8 (emphases added). However, *113 the proper focus for the majority’s decision is not whether Samuel presented sufficient evidence on the elements of his false arrest claims (including the absence of probable cause — an absence that the properly instructed jury presumably found proven in finding defendants liable to Samuel on these claims). For the grant of judgment as a matter of law to these defendants on the basis of qualified immunity, the proper question is whether the evidence compels the conclusion that it was objectively reasonable for a police officer in their position to believe there was probable cause to arrest Samuel — an affirmative defense on which defendants have the burden of proof.
Fourth, in my view, what should properly be considered on the issue of arguable probable cause in the present appeal includes all relevant evidence in the district court’s record, not just the evidence admitted at trial. Although the majority states that “[i]n considering defendants’ Rule 50 motion as to [Samuel’s] claims, the District Court properly confined its review to the trial record, ... and we must do the same in considering the claims on appeal,” Majority Opinion at 99 n.8, this position suffers a major flaw: The Rule 50 motion granted by the district court was based on the position that Samuel had failed to prove the absence of probable cause as an element of false arrest, see Figueroa v. Mazza, 59 F.Supp.3d 481, 490-91 (E.D.N.Y. 2014); that decision indeed was to be made on the basis of the evidence admitted at trial. But this is not the basis for the majority’s grant of judgment as a matter of law. The majority’s decision is that defendants are entitled to judgment as a matter of law on the basis of qualified immunity because it views probable cause as “arguable.” The qualified immunity defense was never submitted to the jury; there is thus no reason to limit consideration to the evidence that was admitted. Further, the reports by Detective Deborah Hawkins, which the majority chooses not to consider, are in the district court record. (See, e.g., Trial Transcript (“Tr.”) 551 (statement of defense counsel to the court: “There are documents that explicitly say— that are listed as plaintiffs exhibits that explicitly say Detective Hawkins looked at the reports from the pediatrician ... and that, in fact, the police department called the pediatrician and said you indicated in this letter that you thought that there might have been some sort of anal penetration. What made you say that? And he said I don’t know, it’s possible.” (emphases added)).) The Detective Hawkins reports were in fact offered in evidence at trial — by each side — but were excluded (erroneously each time, in my view: erroneously when offered by Samuel, since the reports (a) showed that the pediatrician confirmed to Detective Hawkins Saenz’s statement that the doctor himself thought “some sort of anal penetration” was “possible,” and (b) confirmed that the police department had in its possession a letter from the doctor to that effect; and erroneously when offered by defendants to show that Hawkins had in fact investigated before reaching a different conclusion).
Finally, even if consideration of defendants’ entitlement to the defense of qualified immunity as a matter of law is limited to the evidence that was admitted at trial, there was ample evidence that in the two weeks preceding Samuel’s arrest Saenz had complained to the police at the 72nd Precinct and to Detective Hawkins of suspected sexual abuse of her son by the boy’s father; evidence that the police and Detective Hawkins were well aware of Saenz’s attempts to document her suspicion with before-and-after pictures; evidence that Saenz had informed Detective Hawkins that two doctors had opined that such molestation was possible; and, in the *114 words of defendants’ own attorney, evidence “that there are doctor reports that indicate that abuse was happening” (Tr. 550).
There was evidence that Samuel complained to the police department’s Internal Affairs Bureau (“IAB”) asserting that Detective Hawkins had failed to investigate; in that complaint Samuel detailed Saenz’s complaints to the police and her submission to the police of before-and-after pictures; and defendants, prior to arresting Samuel, were indisputably aware of Samuel’s IAB complaint. The police department records of these repeated attempts by Samuel and Saenz to get the police to prevent what the boy’s mother and doctors thought could be sexual abuse eliminated any objectively reasonable basis for any officer to believe there was probable cause to arrest Samuel for child pornography or child endangerment.
A. The Trial Evidence
It is undisputed that for some two weeks prior to the arrest of Samuel, Shirley Saenz, accompanied by Samuel, had repeatedly complained to the police that, when her son had an overnight visit with his father, the boy was returned to her with bruises and swelling in his anal area and that doctors said it was possible that the boy was being sexually molested. Saenz testified at trial: “[0]n June 5th of 2010, my son came back to me with red anal swelling”; “I took him to Methodist Hospital”; “I showed the doctor, Doctor Farebrothers [sic], and she said it looks like my son was getting molested, so she made a report to the state central registry.” (Tr. 58-59; see, e.g., id. at 119 (“the hospital told me on June 5th that it was possible that my son was getting molested”).) When her son “continued to come back” from visits with his father “with anal traumas,” Saenz complained to the police and began to document the boy’s changed condition with pictures of him before and after his visits with his father; she was allowed to take such pictures in the police station. (Tr. 57 (“at the precinct ... the police officer said it was fine to do it like away from the public in the backroom”).) Other sets of pictures were taken in the office of the boy’s pediatrician; Saenz testified that that doctor too “had told me that it looked like my son was getting possibly anally penetrated and he wrote a letter to the Family Court” (Tr. 58; see also id. at 118-19 (“Doctor Hassan, my son’s ped[ia-tric]ian, said that it was possible my son was getting molested. That’s what he said and he wrote it in a letter .... ”)).
On June 15, two weeks before the police department’s June 29 receipt of the Duane Reade photos on which they based their arrest of Samuel, Saenz — accompanied by Samuel — had informed police at the 72nd Precinct and Detective Hawkins at the police department’s Brooklyn Child Advocacy Center (“Child Advocacy Center”) of her suspicion that her son was being molested by his father, and had given them pictures that, like the Duane Reade photos, were before-and-after pictures of the boy’s body. (See, e.g., Tr. 64-65 (testimony of Saenz); 533-37, 541-42 (testimony of Samuel).) Saenz testified:
I went to the 72nd Precinct. I told them that I was taking the photographs on the advise [sic] of my attorney and according to Social Service laws 415, 416, 419, and then I told them that I was concerned-that my son could have been getting molested and they didn’t let me write a report. They just took a copy of everything that I had, like the hospital record, the photographs and they faxed it over to Brooklyn Child Advocacy Center and they made copies and I spoke with — spoke with Lieutenant Jaime Ortiz .... And there was like another officer there, and they actually put me *115 on the phone with Detective Deborah Hawkins ....
(Tr. 64-65 (emphases added).) In that telephone conversation, Saenz told Detective Hawkins “I think my son is getting molested, this is what the doctor said_” (Tr. 65; see also id. at 542 (testimony of Samuel that 72nd Precinct officers faxed to Detective Hawkins “[t]he doctor’s report — before-and-after doctor’s report”).)
On June 16, Saenz went to the Child Advocacy Center and met with Detective Hawkins, who had received the materials — including the photos — sent to her by the officers at the 72nd Precinct. Saenz testified that when Detective Hawkins asked “why do you think your son is getting molested. I told her it was based on what my doctor said, based on what the hospital said.” (Tr. 66.)
Saenz testified that Detective Hawkins would not allow her to make a formal complaint of child abuse. Saenz complained that the police department and Detective Hawkins, “didn’t do anything.” (Tr. 59.)
On June 28, Samuel telephoned IAB, identified himself, and complained that Hawkins had not allowed Saenz to file a child-abuse complaint against the boy’s father. (See Tr. 544-48.) Samuel’s IAB complaint was “[v]ery detailed” (Tr. 547) as to Saenz’s efforts, including her showing the police the pictures she had taken to document her concerns. He provided addresses and telephone numbers for the boy’s father, as well as for Saenz’s mother Beatrice Saenz (“Beatrice”), about whom Samuel also complained.
Defendants plainly were aware of the contents of Samuel’s June 28 complaint to IAB: It was only by means of information in that complaint that they located Beatrice, whom they interviewed prior to arresting Samuel. And, as the majority opinion notes, in all other respects “defendants do not contest that all relevant officers had knowledge of Samuel’s complaint and Saenz’s report at all relevant times,” Majority Opinion at 95 n.5 (emphasis added); see id. at 96 n.6.
B. The “Arguable Probable Cause” Standard Is Not Met
When determining whether actual probable cause existed, we “look to the totality of the circumstances” as to what the officers knew at the time of the arrest; we “must consider those facts available to the officer at the time of the arrest and immediately before it,” bearing in mind that “an officer may not disregard plainly exculpatory evidence.” Fabrikant v. French, 691 F.3d 193, 214 (2d Cir. 2012) (internal quotation marks omitted) (emphases mine); see also Hunter v. Bryant, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (qualified immunity does not protect “the plainly incompetent” (internal quotation marks omitted)). “Review for probable cause should encompass plainly exculpatory evidence alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest.” Stansbury v. Wertman, 721 F.3d 84, 93 (2d Cir. 2013) (internal quotation marks omitted) (emphasis mine).
In determining whether there was “arguable” probable cause, for purposes of qualified immunity, our focus is no narrower; “we examine the same evidence under the same circumstances,” id. at 89 n.3, for arguable probable cause does not “mean ‘almost’ probable cause,” Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007). Rather, the test for arguable probable cause is “whether it was objectively reasonable for the officer to conclude that probable cause existed.” Id.
The majority acknowledges that “an officer making a probable-cause determination *116 is not at liberty to ignore evidence tending to exculpate the suspect ... and that the officers [here] were accordingly not entitled to disregard ... their knowledge of Saenz’s earlier photos,” Majority Opinion at 102. The majority finds arguable probable cause, however, on the basis that “officers of reasonable competence could have ... disbelieved Saenz’s explanation” — apparently referring to her reason for taking photos of her unclothed son — and that “[t]he officers were not required to accept Saenz’s account on faith,” Majority Opinion at 102 (emphases added). This would be far more persuasive if defendants were considering an explanation given after-the-fact and if ample support for Saenz’s “account” were not already in police records weeks before receipt of the Duane Reade photos. As the police had no contact with Saenz between their June 29 receipt of the Duane Reade photos and Samuel’s June 30 arrest, the reference to a Saenz “explanation” apparently refers to Saenz’s proffers of such photographs earlier. But police department records clearly documented that Saenz had submitted such photos to the police in mid-June in an effort to provide evidentiary support for her suspicions of child abuse by the boy’s father. And whether or not her suspicions were correct, it is undisputed that Saenz repeatedly told Detective Hawkins that both the boy’s pediatrician and Doctor Fairbrother at Methodist Hospital had stated that it was possible that the boy had been subjected to some type of anal penetration.
Officers of course are not required to take a complainant’s assertions “on faith,” and defendants here certainly were not required to believe that Saenz’s son had in fact been abused by his father. But nor were defendants entitled to conclude without any investigation that Saenz’s repeated communications of her concerns to the police department were a sham. And the most obvious line of inquiry would have quickly shown that her concern was genuine. As defendants “at all relevant times” “had knowledge of Samuel’s complaint and Saenz’s report,” Majority Opinion at 95-96 n.5, the most obvious course would have been to inquire of Detective Hawkins, who was most sharply criticized in Samuel’s complaint to IAB about the handling of Saenz concerns. Had they inquired, defendants would have learned that Detective Hawkins’s file included a copy of the letter from the pediatrician indicating that he thought that there might have been some sort of anal penetration (see Tr. 542 (72nd Precinct officers faxed to Detective Hawkins “[t]he doctor’s report — before-and-after doctor’s report”)). Further, if defendants had read Detective Hawkins’s reports, they would have seen that the pediatrician reiterated to Detective Hawkins that “it’s possible” that “there might have been some sort of anal penetration” (Tr. 551 (statement of defense counsel)).
This record- — -whether or not Detective Hawkins’s reports are considered — does not allow defendants to prevail on a defense of arguable probable cause, for they were not entitled to ignore the record of Saenz’s efforts, with Samuel’s assistance, to protect her son. Defendants knew of the complaints to — and about — Detective Hawkins. If they asked what was in Detective Hawkins’s files or what her investigation had turned up, they could not “disbelieve[]” Saenz’s “explanation” except by arbitrarily ignoring this clearly exculpatory evidence that resided in the relevant police records. And if they failed to inquire, their investigation clearly was not competent. Qualified immunity does not protect “the plainly incompetent.” Hunter, 502 U.S. at 229, 112 S.Ct. at 537 (internal quotation marks omitted).
The majority’s view that a reasonable officer could have concluded that the pho *117 tos constituted crimes of child pornography or child endangerment on the theory that Saenz was willing to share nude pictures of the boy “with perfect strangers,” to wit, the “Duane Reade employees [who] would likely see the photos in the normal course of developing them,” Majority Opinion at 103-04, improperly draws inferences contrary to Samuel and the record. The Duane Reade surveillance tape that police officers reviewed on June 30 showed that Saenz in fact had attempted to have the pictures — taken with a digital camera- — - printed not by Duane Reade employees but rather by a Duane Reade computerized self-service printer. The photos were eventually retrieved from the printer by a Duane Reade employee only because the self-service system had malfunctioned. Saenz’s thwarted attempt to print the pictures herself in no way indicated a willingness to have them seen by strangers.
In my view, in light of these facts that were known to the police, and were known or available to defendants prior to Samuel’s arrest, no reasonable officer could have concluded that there was probable cause to believe that the crime of either child pornography or child endangerment had been committed.
I note that the majority does not actually specify the crime as to which it concludes defendants had arguable probable cause to arrest Samuel; if they had arguable probable cause as to any crime, even if there was not agreement among the defendants as to which crime, they were entitled to that defense, cf. Devenpeck v. Alford, 543 U.S. 146, 152-56, 125 S.Ct. 588, 593-95, 160 L.Ed.2d 537 (2004). For the reasons stated above, I see no basis for arguable probable cause as to child pornography or child endangerment. Nor was there a basis to arrest Samuel for kidnaping. Although the majority opinion suggests that defendants, having viewed the June 25 Duane Reade photos, did not know Saenz’s son was not being held as a “kidnap[ ]” victim until “[s]hortly after Samuel’s [June 30] arrest,” Majority Opinion at 96-97 (emphasis added), they in fact knew he was not being so held before Samuel was arrested. Police records show that at 9 p.m. on June 30, defendant Todd Nagrowski and other officers interviewed Saenz’s roommate, who told them, inter alia, that she had left Saenz and the boy asleep in the living room that morning. As the majority concedes, defendants were “not entitled to disregard th[is] information from [Saenz’s roommate],” Majority Opinion at 102. Thus, when Nagrowski and others proceeded to arrest Samuel after 10 o’clock that night, defendants had no reason to believe there had been a kidnaping.
Finally, even if there had been arguable probable cause to believe a crime had been committed, there was no evidence to warrant a person of reasonable caution in the belief that the crime had been committed by Samuel. The police had no evidence that Samuel had any role in the taking of the Duane Reade pictures, or was present when they were taken, or participated in the attempt to have them printed. The police reviewed the Duane Reade surveillance tape of the person attempting to have the pictures printed; that person was a woman. The 11 telephone calls to Duane Reade thereafter, asking that the pictures not be printed, were all made by a woman. In addition, the photos included an image of a dated money order, and the police were able to obtain a surveillance picture of its purchase; they saw that the purchaser of the money order was also a woman.
The only objective evidence the police had of any conduct by Samuel in connection with the Duane Reade photos was that he had accompanied Saenz when she gave similar pictures to the police in an effort to prevent further harm to her son, that he *118 complained to IAB when the police refused to assist Saenz in that effort, and that he apparently loaned the woman who called Duane Reade his phone.
Given the totality of the circumstances, including the documentation in the police files as to Saenz’s intense communications with the police about her suspicion that her son was being abused, accompanied by her report of multiple doctors’ statements and a copy of least one doctor’s written opinion that her suspicion could be correct — all of which defendants knew or should have known — I dissent from so much of the majority opinion as rules that defendants are entitled to qualified immunity on Samuel’s false arrest claims as a matter of law.